Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3453 to 25-3494,
23-3563, 25-3564

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

CRYSTALLEX INTERNATIONAL CORPORATION,

*Plaintiff-Appellee*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

On Appeals From The United States District Court
For The District of Delaware
No. 1:17-mc-151-LPS, Judge Leonard P. Stark (sitting by designation)

## BRIEF OF PLAINTIFF-APPELLEE
## CRYSTALLEX INTERNATIONAL CORPORATION

Robert L. Weigel
Rahim Moloo
Jason W. Myatt
Zachary Kady
Vanessa Ajagu
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Raymond J. DiCamillo
Jeffrey L. Moyer
Travis S. Hunter
RICHARDS, LAYTON & FINGER, P.A.
1 Rodney Square 920 N. King St.
Wilmington, DE 19801
(302) 651-7700

Miguel A. Estrada
  *Counsel of Record*
Lucas C. Townsend
Jeffrey Liu
Brian C. McCarty
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500

Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Plaintiff-Appellee Crystallex International Corp.*

TIDEWATER INVESTMENT SRL, ET AL.,

*Plaintiffs-Appellees,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

OI EUROPEAN GROUP, B.V.,

*Plaintiff-Appellee,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

PHILLIPS PETROLEUM COMPANY VENEZUELA LTD, ET AL.,

*Plaintiffs-Appellees,*

v.

PETROLEOS DE VENEZUELA S.A., ET AL.,

*Defendants-Appellants.*

NORTHRUP GRUMMAN SHIP SYSTEMS INC.,

*Plaintiff-Appellee,*

v.

MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

CONTRARIAN CAPITAL MANAGEMENT LLC, ET AL.,

*Plaintiffs-Appellees,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

ACL1 INVESTMENTS LTD., ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

RUSORO MINING LTD.,

*Plaintiff-Appellee*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

RED TREE INVESTMENTS LLC,

*Plaintiff-Appellee*,

v.

PETROLEOS DE VENEZUELA S.A., ET AL.,

*Defendants-Appellants.*

KOCH MINERALS SARL, ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

CONOCOPHILLIPS GULF OF PARIA B.V.,

*Plaintiff-Appellee*,

v.

CORPORACION VENEZOLANA DEL PETROLEO, ET AL.,

*Defendants-Appellants.*

XYQ US, LLC,

*Plaintiff-Appellee / Appellant*,

v.

PETROLEOS DE VENEZUELA S.A., ET AL.,

*Defendants-Appellants.*

GOLD RESERVE INC.,

*Plaintiff-Appellee / Appellant*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

CONOCOPHILLIPS PETROZUATA B.V., ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

VALORES MUNDIALES S.L., ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

RUDI LOVATI, ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

GRAMERCY DISTRESSED OPPORTUNITY FUND LLC,

*Plaintiff-Appellee*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE,

*Plaintiff-Appellee*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit L.A.R. 26.1.1(b), Crystallex International Corporation states that it has no parent companies and that no publicly held company holds a 10% or greater ownership interest in Crystallex's shares.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

STATEMENT OF RELATED CASES ...................................................... 8

STATEMENT OF THE CASE ................................................................. 8

      A.    Crystallex Secured A U.S. Judgment Confirming Its Arbitral Award Against Venezuela For Expropriating Investments In Gold Mines ................... 8

      B.    When Venezuela Refused To Pay The Judgment, The District Court Issued A Writ Attaching The PDVH Shares, And This Court Affirmed ....................... 9

      C.    The District Court Fulfilled This Court's Mandate By Developing A Process To Sell The PDVH Shares ............................................................................ 14

      D.    The Venezuela Parties Deploy Repeated Delay Tactics, Including Relitigation And Repetitive Disqualification Motions ............................................... 20

      E.    The District Court Approved The Sale Of The PDVH Shares To Elliott's Acquisition Vehicle ............ 23

SUMMARY OF ARGUMENT .............................................................. 27

STANDARD OF REVIEW .................................................................... 31

ARGUMENT ....................................................................................... 32

    I.    The Writs Of Attachment Are Valid ...................................... 32

      A.    The Venezuela Parties May Not Relitigate Challenges To The Attachments ................................... 33

B.   *Bancec* Governs The Attachment Of Property Held By A Foreign Instrumentality On An Alter-Ego Theory ................................................................. 40

II.   There Is No Basis To Disturb The District Court's Sale Order On Appeal ................................................................. 51

A.   The Sale Complied With Delaware's Highest-Bidder Requirement ...................................................... 51

B.   The Sale Price Was Not Grossly Inadequate ............... 60

C.   The Sale Was Public ...................................................... 66

III.  The Disqualification Requests Were Baseless ...................... 67

A.   The Motions Were Untimely And Waived ................... 68

B.   The District Court Correctly Found That There Was No Basis For Disqualification ............................... 74

C.   Any Purported Conflict Would Not Warrant Vacatur Of The Sale Order .......................................... 85

CONCLUSION ........................................................................... 88

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*,
   183 F.3d 1277 (11th Cir. 1999) ............................................................. 45

*Alevras v. Tacopina*,
   226 F. App'x 222 (3d Cir. 2007) ......................................................... 39

*Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*,
   2024 WL 2318162 (3d Cir. May 22, 2024) ......................................... 63

*In re Allied-Signal Inc.*,
   891 F.2d 967 (1st Cir. 1989) ............................................................... 83

*Am. Electric Power Co. v. Connecticut*,
   564 U.S. 410 (2011) ............................................................................. 49

*Anderson v. Bessemer City*,
   470 U.S. 564 (1985) ............................................................................. 63

*Andrus v. Glover Constr. Co.*,
   446 U.S. 608 (1980) ............................................................................. 83

*Arnold v. Blast Intermediate Unit 17*,
   843 F.2d 122 (3d Cir. 1988) ............................................................... 49

*In re Bakalis*,
   220 B.R. 525 (Bankr. E.D.N.Y. 1998) ............................................... 59

*Banco Nacional de Cuba v. Sabbatino*,
   376 U.S. 398 (1964) ............................................................................. 50

*BFP v. Resol. Tr. Corp.*,
   511 U.S. 531 (1994) ............................................................................. 65

*Bolivarian Republic of Venezuela v. Crystallex Int'l Corp.*,
   140 S. Ct. 2762 ..................................................................................... 13

iv

*Bond v. United States*,
  572 U.S. 844 (2014) ......................................................... 84

*Bondi v. VanDerStok*,
  604 U.S. 458 (2025) ......................................................... 35

*Boyle v. United Techs. Corp.*,
  487 U.S. 500 (1988) ......................................................... 49

*In re Brooks*,
  383 F.3d 1036 (D.C. Cir. 2004) ........................................ 87

*Burge v. Fid. Bond & Mortg. Co.*,
  648 A.2d 414 (Del. 1994) ............................................ 60, 61

*Cheney v. U.S. District Court*,
  541 U.S. 913 (2004) ......................................................... 75

*Christiansen v. Mech. Contractors Bid Depository*,
  404 F.2d 324 (10th Cir. 1968) ......................................... 47

*Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*,
  714 F. Supp. 3d 416 (S.D.N.Y. 2024) .............................. 47

*Cooper Distrib. Co. v. Amana Refrigeration, Inc.*,
  180 F.3d 542 (3d Cir. 1999) ............................................ 31

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  244 F. Supp. 3d 100, 122 (D.D.C. 2017) ............................ 8

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  2017 WL 6349729 (D.D.C. June 9, 2017) ........................... 9

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  760 F. App'x 1 (D.C. Cir. 2019) ........................................ 9

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  932 F.3d 126 (3d Cir. 2019) ............................ 2, 8, 9, 10, 12, 13, 32,
                                              34, 35, 37, 38, 44, 48, 49

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
    24 F.4th 242 (3d Cir. 2022) ................................................. 20, 33, 34, 35

*Deibler v. Atl. Props. Grp., Inc.*,
    652 A.2d 553 (Del. 1995) ............................................. 32, 51, 61, 62, 64

*Del. River Port Auth. v. Fraternal Order of Police*,
    290 F.3d 567 (3d Cir. 2002) ................................................................ 39

*EM Ltd. v. Republic of Argentina*,
    473 F.3d 463 (2d Cir. 2007) ................................................................ 44

*Erie R.R. v. Tompkins*,
    304 U.S. 64 (1938) .............................................................................. 47

*First National City Bank v. Banco Para el Comercio
    Exterior de Cuba*,
    462 U.S. 611 (1983) ...................................................... 2, 34, 43, 44, 50

*Fischer v. United States*,
    603 U.S. 480 (2024) ............................................................................ 84

*Frank v. Colt Indus., Inc.*,
    910 F.2d 90 (3d Cir. 1990) ................................................................. 73

*Girard Tr. Bank v. Castle Apartments, Inc.*,
    379 A.2d 1144 (Del. Super. Ct. 1977) ........................................... 61, 66

*Goldman Sachs & Co. v. Athena Venture Partners, L.P.*,
    803 F.3d 144 (3d Cir. 2015) ............................................................... 74

*Helmerich & Payne Int'l Drilling Co. v. Venezuela*,
    153 F.4th 1316 (D.C. Cir. 2025) ......................................................... 13

*Henglein v. Colt Indus. Operating Corp.*,
    260 F.3d 201 (3d Cir. 2001) ............................................................... 38

*Hook v. McDade*,
    89 F.3d 350 (7th Cir. 1996) ............................................................... 85

*Huff Fund Inv. P'ship v. CKx, Inc.*,
  2013 WL 5878807 (Del. Ch. Nov. 1, 2013) ......................................... 58

*IFC Interconsult, AG v. Safeguard International
  Partners, LLC*,
  438 F.3d 298 (3d Cir. 2006) ................................................................ 46

*In re Int'l Bus. Machs. Corp.*,
  45 F.3d 641 (2d Cir. 1995) ................................................................. 71

*Jenkins v. Sterlacci*,
  849 F.2d 627 (D.C. Cir. 1988) ............................................................ 87

*Karaha Bodas Co. v. Perusahaan Pertambangan Minyak
  Dan Gas Bumi Negara*,
  313 F.3d 70 (2d Cir. 2002) ................................................................. 45

*In re Kensington Int'l Ltd.*,
  353 F.3d 211 (3d Cir. 2003) ........................................................ 68, 73

*In re Kensington Int'l Ltd.*,
  368 F.3d 289 (3d Cir. 2004) ............................ 30, 68, 69, 75, 76, 77, 83

*Kingsland Holdings, Inc. v. Bracco*,
  1996 WL 104257 (Del. Ch. Mar. 5, 1996) .......................................... 46

*Klaxon Co. v. Stentor Electric Mfg. Co.*,
  313 U.S. 487 (1941) ........................................................................... 42

*Lawsky v. Condor Cap. Corp.*,
  2015 WL 4470332 (S.D.N.Y. July 21, 2015) ...................................... 58

*Liljeberg v. Health Services Acquisition Corp.*,
  486 U.S. 847 (1988) ........................................................................... 85

*Lilly v. State*,
  649 A.2d 1055 (Del. 1994) ........................................................... 57, 60

*Liteky v. United States*,
  510 U.S. 540 (1994) ........................................................................... 81

*Mackey v. Lanier Collection Agency & Serv., Inc.*,
    486 U.S. 825 (1988) ............................................................... 46

*Marcavage v. Bd. of Trs. of Temple Univ. of the*
    *Commonwealth Sys. of Higher Educ.*,
    232 F. App'x 79 (3d Cir. 2007) ........................................... 86

*Martin v. Monumental Life Ins. Co.*,
    240 F.3d 223 (3d Cir. 2001) ........................................ 75, 81

*Microsoft Corp. v. United States*,
    530 U.S. 1301 (2000) ........................................................... 85

*Nat'l Auto Brokers Corp. v. Gen. Motors Corp.*,
    572 F.2d 953 (2d Cir. 1978) ........................................ 71, 76

*NLRB v. Deena Artware, Inc.*,
    361 U.S. 398 (1960) ............................................................. 43

*Offredi v. Huhla*,
    60 A.2d 779 (Conn. 1948) ................................................... 66

*OI European Grp. B.V. v. Bolivarian Republic of Venezuela*,
    73 F.4th 157 (3d Cir. 2023) ......................................... 35, 36

*Omega Eng'g, Inc. v. Omega S.A.*,
    432 F.3d 437 (2d Cir. 2005) ............................................... 68

*Pashaian v. Eccelston Props., Ltd.*,
    88 F.3d 77 (2d Cir. 1996) ................................................... 79

*Peacock v. Thomas*,
    516 U.S. 349 (1996) ............................................................. 41

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ........................................... 45

*Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*,
    2025 WL 2958813 (S.D.N.Y. Oct. 17, 2025) ...................... 15

*Raytech Corp. v. White,*
  54 F.3d 187 (3d Cir. 1995) .................................................... 31

*Republic of Argentina v. NML Capital, Ltd.,*
  573 U.S. 134 (2014) ............................................................ 49

*Rubin v. Islamic Republic of Iran,*
  583 U.S. 202 (2018) ........................................................ 41, 49

*Schweiker v. McClure,*
  456 U.S. 188 (1982) ............................................................ 75

*Segal v. Rochelle,*
  382 U.S. 375 (1966) ............................................................ 42

*Selkridge v. United of Omaha Life Ins. Co.,*
  360 F.3d 155 (3d Cir. 2004) .............................................. 85, 87

*Semtek Int'l Inc. v. Lockheed Martin Corp.,*
  531 U.S. 497 (2001) ............................................................ 42

*Taylor v. Comm'r of Pa. Dep't of Corr.,*
  150 F.4th 188 (3d Cir. 2025) ................................................ 36

*Texas Indus., Inc. v. Radcliff Materials, Inc.,*
  451 U.S. 630 (1981) ............................................................ 50

*TransPerfect Holdings LLC v. Pincus,*
  2025 WL 1691473 (3d Cir. June 17, 2025) ............................. 85

*Truskoski v. ESPN, Inc.,*
  60 F.3d 74 (2d Cir. 1995) ..................................................... 55

*United States v. Belmont,*
  301 U.S. 324 (1937) ............................................................ 50

*United States v. Ciavarella,*
  716 F.3d 705 (3d Cir. 2013) .............................................. 32, 75

*United States v. Nobel,*
  696 F.2d 231 (3d Cir. 1982) ................................................. 74

*United States v. Stone,*
  866 F.3d 219 (4th Cir. 2017)................................................................85

*United States v. Wecht,*
  484 F.3d 194 (3d Cir. 2007) ...............................................................32

*Vornado PS, L.L.C. v. Primestone Inv. Partners, L.P.,*
  821 A.2d 296 (Del. Ch. 2002) .............................................................52

*Wedgewood Vill. Pharmacy, Inc. v. United States,*
  421 F.3d 263 (3d Cir. 2005) ...............................................................31

*Weinstein v. Islamic Republic of Iran,*
  831 F.3d 470 (D.C. Cir. 2016).......................................................41, 50

*Westinghouse Electric Corp. v. Kerr-McGee Corp.,*
  580 F.2d 1311 (7th Cir. 1978)............................................................76

## Statutes

28 U.S.C. § 455(a) ...........................................................30, 74, 82, 83

28 U.S.C. § 455(b)(4)...................................................30, 74, 82, 83, 84

28 U.S.C. § 455(d)(4)......................................................................83, 84

28 U.S.C. § 1291...........................................................................12, 35

28 U.S.C. § 1606...............................................................................44

28 U.S.C. § 1610(a) ..........................................................................48

28 U.S.C. § 1610(a)(6).................................................................10, 11

28 U.S.C. § 2072(b) ..........................................................................42

8 *Del. C.* § 324 ...................................................25, 26, 28, 52, 59, 67

8 *Del. C.* § 324(a)......................................................10, 28, 29, 51, 66

## Rules

Fed. R. App. P. 28(i)..........................................................................31

Fed. R. Civ. P. 53(a)(2) ............................................................... 82

Fed. R. Civ. P. 69(a)(1) .................................. 10, 28, 41, 44, 45, 46, 47, 48

**Other Authorities**

*Black's Law Dictionary* (12th ed. 2024)................................................. 66

Restatement (Second) of Judgments (1982) ............................................ 39

Wright & Miller, *Federal Practice and Procedure*
  (3d ed. Sept. 2025 update) ................................................................. 36

## INTRODUCTION

Venezuela is a recalcitrant debtor that refused to pay final and unappealable judgments arising from its billion-dollar thefts and repeated payment defaults. Adding insult to injury, Venezuela, Petróleos de Venezuela, S.A. (PDVSA), PDV Holding, Inc. (PDVH), and CITGO Petroleum Corporation (collectively, the Venezuela Parties) have fought tooth and nail for years to prevent victims from enforcing final federal-court judgments against Venezuela's property in Delaware. But after nearly a decade of Herculean effort, a district court has finally conducted a judicial sale of a Delaware asset that Venezuela owns and uses to profit in this country—shares in a holding company that owns major refining assets in the United States. If this Court affirms and the Executive Branch approves the sale, victims of Venezuela's wrongdoing will at last be paid.

Crystallex International Corporation is the lead plaintiff and first-priority attachment holder in these proceedings. In 2011, Venezuela stole gold-mining interests from Crystallex, which won an arbitration award and has held a $1.2 billion judgment confirming that award since 2017. Venezuela ignores arbitration awards and does not honor federal-court judgments, so Crystallex moved to attach Venezuela's commercial

assets in Delaware—the PDVH shares, which are nominally owned by PDVSA, Venezuela's national oil company.  Because Venezuela had so completely disregarded PDVSA's separate legal identity, the district court did too and ordered the attachment of the PDVH shares under the alter-ego standard of *First National City Bank v. Banco Para el Comercio Exterior de Cuba*, 462 U.S. 611 (1983) (*Bancec*).  Once this Court affirmed the attachment in 2019, there was "nothing left to do but execute." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 136 (3d Cir. 2019) (*Crystallex II*).

These appeals test this Court's warning that "[a]ny outcome where Crystallex is not paid means that Venezuela has avoided its obligations." *Crystallex II*, 932 F.3d at 149.  Heeding that statement, the district court on remand spent seven years developing a process to sell the PDVH shares, which are valuable because PDVH indirectly owns CITGO, a large oil refiner.  The sale proceeds will satisfy judgments held by Crystallex and other unpaid creditors of Venezuela and PDVSA.  To over-see the sale, the court appointed the special master recommended by the Venezuela Parties themselves, authorized him to hire legal and financial advisors, and invested hundreds of hours of judicial time in supervising,

devising, and continually adjusting sale procedures to address the parties' concerns. All the while, the court also navigated sanctions imposed by the Executive Branch through the Office of Foreign Assets Control (OFAC) that long prevented the granting of unconditional attachments to anyone but Crystallex, while also blocking consummation of the sale.

The district court and the special master also had to design a process that could withstand other risks created by the Venezuela Parties' penchant for stonewalling creditors and ignoring judgments. Most notably, PDVSA had defaulted on billions of dollars of bonds that gave their holders (the Bondholders) a lien on 50.1% of the equity in CITGO Holding, a company sitting between PDVH and CITGO. Because debts secured by CITGO Holding's shares are structurally senior to obligations secured by the shares of PDVH, the Bondholders could seek to block any actions that would impair the value of CITGO, such as attempts to encumber CITGO's assets to finance the purchase of the PDVH shares. Litigation by the Venezuela Parties seeking to invalidate the bonds proceeded in the Southern District of New York for years, but was resolved in the Bondholders' favor during the sale hearing in these cases. The Bondholders hold a judgment for approximately $3 billion.

In April 2023, OFAC gave the green light for the district court to issue unconditional attachments to holders of judgments other than Crystallex, whose attachment had issued before the imposition of sanctions, and to proceed toward (but not close) a sale. Amber MSub LLC, an acquisition vehicle wholly owned by Elliott Investment Management L.P., emerged with the winning bid of $5.892 billion after multiple bidding rounds in 2024 and 2025, thousands of pages of briefing and evidence, and six days of hearings in September and October 2025. To neutralize a major threat to closing, Elliott's bid proposed to resolve the competing claims by the Bondholders (now a $3 billion judgment) at nearly a billion-dollar discount, distributing that value to creditors in Delaware. Elliott had not only the best bid—delivering nearly $9 billion in debt relief to the Venezuela Parties—but also the only viable one by the end of the sale hearing. The other main competing bidder, Gold Reserve Ltd., had seen its bid disintegrate because its financing arrangement contemplated billions in loans secured by CITGO's assets but lacked any concrete plan to mitigate the blocking risk posed by the Bondholders.

Now that the district has approved the sale in a meticulous 162-page order, the Venezuela Parties try to turn the clock back to 2019. They

argue that the district court should have applied Delaware's alter-ego standard by virtue of Federal Rule of Civil Procedure 69(a), even though they previously conceded that *Bancec*'s federal-common-law standard governed the attachment of PDVSA's property.  Because this Court affirmed the writ of attachment in *Crystallex II*, the district court correctly decided that the mandate rule and collateral estoppel barred the Venezuela Parties' attempt to relitigate the applicable alter-ego standard.  Regardless, Rule 69(a) borrows only *procedures* on execution and cannot override *Bancec*'s federal standard for disregarding a foreign instrumentality's separate juridical status.

Appellants' fallback position that the district court should rerun the sale is equally meritless.  Gold Reserve was not the "highest bidder" under Delaware law—nor even a legitimate bidder by the end of the sale hearing.  The purchase price does not shock the conscience and in fact delivered the Venezuela Parties more debt relief than the PDVH shares are worth under the district court's unchallenged factual findings and according to the Venezuela Parties' own representations just a few years ago.  And the district court conducted a "public sale" under Delaware law.  A more public sale is hard to imagine.

The district court also did not err in rejecting the Venezuela Parties' and Gold Reserve's attempts to disqualify the special master on the eve of the final sale hearing based on unrelated work by his legal and financial advisors, Weil and Evercore, for Elliott affiliates and some Bondholders. Everyone knew from the start that the advisors, who had the necessary experience precisely because they regularly do business with the universe of potential buyers for CITGO, could continue to conduct unrelated business. Having presided over years of never-ending delay tactics, the court acted well within its discretion in deeming the latest effort untimely and waived. And the motions were baseless anyway because the advisors' unrelated matters—for fees that represented a miniscule fraction of those firms' annual revenues—posed no structural conflict of interest and would not lead a reasonable observer to question the special master's impartiality.

Nor would any conflict justify vacating and re-running the sale. This Court has held that an impartial adjudicator's de novo review cleanses any taint from earlier conflicts in the adjudicative process. The district court engaged in just such review here, superintending the sale

process, hearing innumerable objections, and overruling the special master and his advisors at multiple junctures. This Court has cautioned most forcefully in cases like this one—where the district court has guided an enormously complex, multi-year litigation to a fragile resolution, with no evidence that the final adjudicator himself was conflicted—that reasonable observers would not question the fruits of such independent review.

This Court should affirm the sale order and bring these attachment proceedings to a long-overdue close. The Venezuela Parties have been heard on all issues—often more than once. The amount of process in this case could not possibly cause "public confidence in the judiciary" to falter. Venezuela Br. 50. To the contrary, public confidence in the judiciary depends on the judiciary's ability to enforce its own judgments against recalcitrant debtors like Venezuela. Because the district court accomplished the satisfaction of massive outstanding judgments in the face of extreme litigiousness without sacrificing fairness, acceding to the requests to set aside the sale order would only discredit the judiciary whose legitimacy Venezuela now purports to defend. The order should be affirmed.

## STATEMENT OF RELATED CASES

Crystallex adopts the Venezuela Parties' statement (Br. 2-3) of related cases and proceedings.

## STATEMENT OF THE CASE

### A.   Crystallex Secured A U.S. Judgment Confirming Its Arbitral Award Against Venezuela For Expropriating Investments In Gold Mines

In 2002, Crystallex contracted with Venezuela for "the right to develop and extract exclusively for 20 years the gold deposits at Las Cristinas," which are "among the world's largest." *Crystallex II*, 932 F.3d at 133. Crystallex "spent hundreds of millions of dollars developing the Las Cristinas site." *Id.* But in 2011, Venezuela nationalized its gold mines, expropriating Crystallex's contractual interest. *Id.* Crystallex initiated an arbitration under a bilateral investment treaty between Canada and Venezuela, and won an award against Venezuela of $1.2 billion plus interest. *Id.*

In 2017, a district court confirmed Crystallex's arbitration award, entered judgment for Crystallex, and permitted Crystallex to execute on assets in other districts to satisfy the judgment. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 244 F. Supp. 3d 100, 122 (D.D.C. 2017);

8

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2017 WL 6349729 (D.D.C. June 9, 2017).  The D.C. Circuit affirmed the judgment and sanctioned Venezuela for misrepresentations designed to delay proceedings.  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 760 F. App'x 1, 2-3 (D.C. Cir. 2019).

**B.    When Venezuela Refused To Pay The Judgment, The District Court Issued A Writ Attaching The PDVH Shares, And This Court Affirmed**

Because Venezuela refused to pay the final judgment confirming the arbitral award, Crystallex registered its judgment in the District of Delaware and moved to attach shares nominally held by PDVSA—Venezuela's wholly owned oil company—in its wholly owned Delaware subsidiary, PDVH.  *Crystallex II*, 932 F.3d at 133-34.  PDVH wholly owns CITGO Holding, Inc., which in turn wholly owns CITGO Petroleum Corp., the fifth-largest petroleum-refining company in the United States.  JA268.  Crystallex argued that the PDVH shares, though nominally held by PDVSA, were Venezuela's property because PDVSA is Venezuela's alter ego for purposes of attachment in aid of execution.  *Crystallex II*, 932 F.3d at 134.

Crystallex's motion for a writ of attachment invoked both the Foreign Sovereign Immunities Act and Rule 69. JA1458. The FSIA authorized attachment to pay Crystallex's confirmed arbitral award only if the PDVH shares were "property in the United States of a foreign state" and "used for a commercial activity in the United States." 28 U.S.C. § 1610(a)(6). Rule 69 also required that "[t]he procedure on execution . . . must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1). Delaware law permits judgment creditors like Crystallex to attach shares in a Delaware corporation and to have "[s]o many of the shares . . . sold at public sale to the highest bidder, as shall be sufficient to satisfy the debt." 8 *Del. C.* § 324(a).

PDVSA intervened and moved to dismiss, arguing that it was not Venezuela's alter ego and thus was entitled to its own sovereign immunity under the FSIA. *Crystallex II*, 932 F.3d at 134. PDVSA separately opposed Crystallex's motion for a writ of attachment on the theory that its assets were immune from attachment under the FSIA. JA1550-1553. Although PDVSA conceded that "federal common law" (*i.e.*, *Bancec*) governs whether Crystallex could attach the PDVH shares as Venezuela's property, it contended that federal law incorporates Delaware's rule that

10

an entity is an alter ego only when "the corporate form is abused to perpetrate a fraud against the plaintiff."  JA1529-1530.

The district court (Stark, J.) denied PDVSA's motion to dismiss and granted Crystallex's motion for a writ of attachment.  Applying *Bancec*, the court held that "federal law, not state law," governs whether the PDVH shares are Venezuela's property because "the pertinent relationship is that between Venezuela and PDVSA"—a foreign state and its wholly owned instrumentality—"neither of which is a Delaware corporation." JA1759.  The court rejected PDVSA's Delaware "state-law alter ego standards" as "unhelpful."  JA1774-1775.  The district court held that, for both "[s]ubject matter jurisdiction" and "the merits," "PDVSA is the alter ego of Venezuela," and "PDVSA's shares in PDVH" are "property of Venezuela" and thus subject to attachment and execution to satisfy Venezuela's debts.  JA1755, JA1776, JA1792-1793.

The district court also determined that Crystallex satisfied the remaining requirements for attachment.  The PDVH shares were "used for a commercial activity in the United States," as required by the FSIA. JA1795-1805 (quoting 28 U.S.C. § 1610(a)(6)).  And Crystallex's request

11

complied with Rule 69(a), which incorporated Delaware procedures allowing "'the attachment of a defendant's property in the hands of a third party'"—here, the PDVH shares nominally held by PDVSA. JA1743. The court thus ordered the Clerk to issue and serve the writ "in furtherance of an execution through a public sale of PDVH stock." *Crystallex II*, 932 F.3d at 134.

PDVSA appealed from both the orders (1) denying its motion to dismiss based on immunity and (2) directing the Clerk to issue and serve a writ of attachment. *Crystallex II*, 932 F.3d at 134. This Court exercised jurisdiction to review the sovereign-immunity ruling under the collateral-order doctrine and to review "the grant of Crystallex's motion for a writ of attachment" as a "final judgment under 28 U.S.C. § 1291." *Id.* at 136.

This Court affirmed both the "denial of PDVSA's motion to dismiss as an immune sovereign *and* the grant of Crystallex's motion for a writ of attachment under Federal Rule of Civil Procedure 69." *Crystallex II*, 932 F.3d at 136 (emphasis added). The Court rejected the argument that "*Bancec* cannot be used . . . to reach the assets of PDVSA" and held that, "so long as PDVSA is Venezuela's alter ego under *Bancec*, the District

Court had the power to issue a writ of attachment on that entity's non-immune assets to satisfy the judgment against the country," even without "satisfy[ing] an element of fraud." *Id.* at 138-39, 145. Venezuela's control over PDVSA "easily" satisfied *Bancec*'s "extensive-control requirement" for an alter-ego relationship. *Id.* at 152.

The Venezuela Parties sought further review of both jurisdiction and the attachment's validity. In first seeking rehearing en banc, they acknowledged that this Court "affirmed the district court's attachment order." Venezuela Pet. 6, *Crystallex II*, *supra* (No. 18-2797); *accord* PDVSA Pet. 1, *Crystallex II*, *supra*. This Court denied that petition. When they then sought certiorari, the Venezuela Parties again recognized that this Court "affirmed the district court's issuance of a writ of attachment against PDVSA's shares of PDVH" under *Bancec*. Pet. 6-7, *Bolivarian Republic of Venezuela v. Crystallex Int'l Corp.*, 140 S. Ct. 2762 (No. 19-1049). The Supreme Court denied that petition, too. *See also Helmerich & Payne Int'l Drilling Co. v. Venezuela*, 153 F.4th 1316, 1329-30 (D.C. Cir. 2025) (agreeing that PDVSA is Venezuela's alter ego because of the extensive control exercised by Venezuela).

## C.    The District Court Fulfilled This Court's Mandate By Developing A Process To Sell The PDVH Shares

On remand, the district court developed a process for a judicial sale of the PDVH shares to pay Crystallex's and others' attached judgments. The Venezuela Parties nominated, and the court appointed, Robert B. Pincus as special master to propose and implement a sale process. JA2427, JA2438. The court authorized the special master to retain Weil, Gotshal & Manges LLP as his legal advisor and Evercore Group LLC as his financial advisor based on their "extensive experience" working on complex sales. JA2547-2549. The court designated Crystallex, ConocoPhillips, and the Venezuela Parties as "Sale Process Parties" to work with the special master on all aspects of the sale and required them to pay the special master's and his advisors' fees. JA3276-3314.

Together with the Sale Process Parties, the special master evaluated a variety of transaction types to ensure that the sale process would maximize value and comply with Delaware's procedural requirements for a well-marketed public sale. The special master recommended—and, after seven iterations, the district court adopted—a process for the judicial sale of the PDVH shares, with multiple bidding rounds to generate maximum competition. JA277-279. At the court's direction, he posted notices

14

of the sale in major newspapers in Delaware, across the United States, and in Venezuela.  JA10705-10724.  He also reached out to over 100 potential bidders (including every potential bidder suggested by the Venezuela Parties).  JA304, JA6531-6537.  Over the course of the sale process, the special master ultimately contacted everyone who might reasonably be interested in acquiring CITGO.  JA13103.

Throughout, other litigation threatened to upend the sale process. PDVSA had issued bonds with a 2020 maturity date, and PDVH pledged to the Bondholders as security for those bonds 50.1% of the stock of CITGO Holding, a PDVH subsidiary and the sole shareholder of CITGO. JA289, JA292.  That pledge, if upheld against legal challenges by PDVSA, could permit the Bondholders to block any sale financed by loans secured by CITGO assets.  During the sale hearing in these proceedings, the Southern District of New York sustained the pledge's validity, and entered judgment against PDVSA awarding the Bondholders around $3 billion and permitting them to exercise their rights.  *Petróleos de Venezuela, S.A. v. MUFG Union Bank, N.A.*, 2025 WL 2958813 (S.D.N.Y. Oct. 17, 2025), appeal pending, No. 25-2652 (2d Cir.).  In 2024, certain creditors of Venezuela and PDVSA who had low priority in (or were absent

from) the sale process also filed suits in state and federal courts seeking to establish that PDVH is the alter ego of PDVSA. JA293. Those alter-ego claims, if successful, would have made PDVH liable for PDVSA's debts and significantly undercut the value of the PDVH shares in any sale. JA294.

After extensively marketing the PDVH shares and soliciting bids for 11 months, the special master recommended in 2024 that the court approve a bid submitted by Elliott. JA295-299. But that bid was unacceptable to judgment creditors in part because the proceeds would be paid into escrow and released to creditors only if the Bondholders' claims to PDVH's assets were held invalid. JA299-300. The special master abandoned the bid at the court's direction. JA299-300. Around the same time, the special master sought to mitigate the risks posed by the alter-ego litigation by moving to enjoin it. JA294. The court denied that motion. JA294-295.

In early 2025, the court relaunched the sale process and ordered the special master to propose revised procedures for the sale. JA299-300. The resulting court-ordered procedures established evaluation criteria that required the special master in recommending a bid to take account

of both the bid price and the certainty of closing, particularly given the risks posed by "the [PDVSA] 2020 Bonds and the Alter Ego Claims." JA302.   During the following two bidding rounds—the stalking-horse round and the topping period—the special master and his advisors again negotiated with bidders to refine their bids and maximize the sale price. *E.g.*, JA5794-5796.  Bids under negotiation during the stalking-horse and topping periods remained confidential, but the special master made key information about each bid available to the public and other bidders immediately after each bidding round ended.  JA5812, JA5914-5922.  Interested buyers were expressly permitted to propose a superior bid at any time.  JA5617-5618.

At the end of the topping period in June 2025, the special master recommended that the district court approve Gold Reserve's bid, which had a headline price of $7.382 billion.  JA318-321.  Despite its nominally high price, the Gold Reserve bid faced significant risks to closing because it depended on securing its financing with CITGO's assets by merging Gold Reserve's intended acquisition vehicle, Adolin, into CITGO.  But the Bondholders repeatedly made clear that, as pledgee of the CITGO Hold-

ing shares, they could block the proposed Adolin-CITGO merger by exercising their rights under the pledge, including the right to vote the shares of CITGO Holding to block any future merger. JA268, JA307-311, JA320. Several senior creditors, including Crystallex, objected to the risks posed by this aspect of Gold Reserve's bid. JA6699 (Crystallex); JA6687-6690 (ConocoPhillips); JA6692 (ACL); JA6720 (OIEG).

Before the district court heard arguments on Gold Reserve's bid, the special master received an unsolicited bid of $5.892 billion from Elliott. Like Gold Reserve, Elliott proposed to finance its purchase in part with debt secured by the assets of CITGO. But unlike Gold Reserve, Elliott had secured a transaction support agreement with the Bondholders to release the lien on CITGO Holding's shares (and provide additional debt relief to PDVSA) in parallel with a $2.125 billion tender offer. JA323-328. The special master recommended accepting Elliott's bid, which was significantly more likely to close than Gold Reserve's. JA327-328.

Gold Reserve moved to strike the special master's determination that Elliott's bid was superior on the ground that that determination violated a $50 million overbid minimum set by the court. JA327. But the

district court denied that motion because the overbid minimum was subject to the special master's discretion to consider even a lower-priced bid that offered greater closing certainty.  JA13421-13423.  Because the special master had switched his recommendation to Elliott but remained a signatory to a proposed stock purchase agreement with Gold Reserve, the court also authorized the special master to terminate Gold Reserve's non-binding purchase agreement and execute one with Elliott.  JA13423-13424.  The court emphasized that this decision was not based on the merits of the respective bids and did not prevent the court from rejecting the special master's recommendation of Elliott and selecting Gold Reserve as the winning bidder.  JA13423-13424.

Gold Reserve claimed that the "termination of our SPA . . . has caused dislocation in our committed debt financing," so "[t]hat committed financing is not in effect."  JA13825.  Once the Southern District upheld the pledge, however, Gold Reserve's proposed financing had become wholly infeasible in any event.  Yet Gold Reserve elected not to secure alternative committed financing or to resubmit any other kind of fully financed bid to the court.  JA413.

### D. The Venezuela Parties Relitigate Old Issues And Obstruct The Sale Process

While the district court conscientiously carried out the mandate of *Crystallex II*, the Venezuela Parties did their best to defy it.

1. Immediately after this Court affirmed the validity of Crystallex's attachment, PDVSA moved to quash it on the theory that Rule 69(a) incorporates under Delaware law the alter-ego standard that this Court had just rejected under *Bancec*.  JA94.  The district court denied the motion because its earlier orders had "rejected whatever challenges PDVSA made to the validity of [the] writ and ordered the writ to be served," JA95, and had been affirmed by this Court, JA97.  The court observed that "[e]ach day that Crystallex does not recover on its judgment is arguably something of an affront to the United States judicial system."  JA116.  The Venezuela Parties appealed from that order, but this Court dismissed the appeal for lack of jurisdiction.  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 24 F.4th 242, 249-56 (3d Cir. 2022) (*Crystallex III*).

PDVSA also moved to quash the writ of attachment on the ground that Delaware law required the physical seizure of the stock certificate, which PDVH then claimed was lost, stolen, or destroyed.  JA1925-1928;

20

*see* D. Ct. Dkt. 645.  Because this argument contradicted PDVSA's earlier assurances that the shares were in Delaware and that Crystallex's attachment provided it with adequate security to stay execution during appeal, the district court held that PDVSA was judicially estopped.  JA99-102.  Later, in 2023, the district court solved the issue of the missing certificate by ordering PDVH to seek the certificate's reissuance in Delaware chancery court.  D. Ct. Dkt. 644.  That court ordered PDVH to reissue the certificate, which PDVH deposited with the special master.  D. Ct. Dkt. 792-2 at 2; D. Ct. Dkt. 810.

2.     The Venezuela Parties also sought to disqualify the special master and his advisors four times.  They first unsuccessfully claimed that the special master's industry-standard fee arrangement with Evercore required disqualification.  JA3011-3060.  The Venezuela Parties then *twice* moved to disqualify the special master for his court-authorized communications with OFAC to obtain guidance with respect to the PDVH shares' sale (blocked assets whose sale would require an OFAC license).  JA3314-3329, JA4419-4432.  Even when OFAC determined that it would not enforce sanctions against entities that participated in the district court's sale process—thereby clearing the path to a competitive bidding

process—the Venezuela Parties preposterously claimed that this Executive Branch policy was somehow the product of the special master's "advocacy." JA10689-10690, JA10693-10694. The district court denied these disqualification requests as untimely, waived, and meritless. JA3541-3549, JA4526-4539. In doing so, the court admonished any party to treat potential grounds to disqualify the special master as "an emergency that requires contacting the Court or doing your level best to contact the Court within a day, two days maybe, three days at most." JA3546.

During the September 2025 sale hearing, the Venezuela Parties lodged a *fourth* motion to disqualify—this time joined by Gold Reserve, which also filed a disqualification motion—on the ground that Weil and Evercore had been retained in unrelated matters by Elliott or its affiliates, various Bondholders, or ad hoc groups containing them. JA10415-10418. The court denied the motions as untimely and waived because the Venezuela Parties and Gold Reserve "did not alert the Court" after "hav[ing] been on notice of the relationships they now attack for quite some time." JA10420; JA10429-10430. The court also deemed the motions meritless because no reasonable observer would question the special

master's impartiality based on unrelated representations by his legal and financial advisors, whose "experience must include familiarity and inter-action with, and almost certainly retention by, the types of entities that would have the means and interest to bid on a company like CITGO." JA10464.  This Court denied Gold Reserve's mandamus petition raising the disqualification issue.  Dkt. 46, *In re Gold Reserve Ltd.*, No. 25-3091 (3d Cir. Nov. 18, 2025).

### E.    The District Court Approved The Sale Of The PDVH Shares To Elliott's Acquisition Vehicle

Notwithstanding the Venezuela Parties' concerted campaign of ob-struction, the district court finally held a four-day sale hearing in Sep-tember 2025.  The special master presented his updated final recommen-dation to accept Elliott's bid, including with live testimony from and cross-examination of Evercore's William Hiltz, who testified to the bid's reasonableness and the robustness of the sale procedures that produced it.  JA13168-13169.

The Venezuela Parties argued that the $5.892 billion sale price was "grossly inadequate" under Delaware law because it was less than half of either the $18.6 billion valuation prepared by their expert, José Alberro, or a $13.2 billion "preliminary assessment" of CITGO's value prepared by

23

Evercore in 2023. *E.g.*, JA9155-9167, JA12069-12070. But on the stand, Alberro acknowledged that his valuation was only "theoretical" and that he had "no opinion" on whether "anyone, anywhere in the world . . . would actually pay $18 billion" for the shares. JA13224-13226. Hiltz also testified that the special master's 2023 estimate of CITGO's value was based on outdated "projections that are now completely off." JA13214-13215.

Red Tree offered the further expert testimony of Gary Kleinrichert, who testified that CITGO's market value lay between $8.4 and $8.6 billion. JA361-362. Kleinrichert reached that valuation after revising CITGO's forecasts slightly downward to reflect CITGO's historical under-performance against its own estimates and testified that CITGO's market value lay between $8.4 and $8.6 billion. JA361-362. He also explained that Alberro could overshoot that valuation so much only by departing from industry standards and dismissing CITGO's own price forecasts in favor of his own custom assumptions, which revised future cash flow estimates significantly above CITGO's own already-optimistic forecasts. JA13336-13341.

After considering days of live testimony, two days of argument in October 2025, and thousands of pages of evidence and briefing, the district court approved the sale of the PDVH shares to Elliott's acquisition vehicle, Amber. JA264-265. The district court determined that Elliott was the "highest bidder" for the PDVH shares under 8 *Del. C.* § 324. Because Gold Reserve's bid was "no longer backed by committed financing," Gold Reserve was not a "bidder" at all, and Elliott (the only remaining bidder) "necessarily ha[d] the highest sale price." JA413. The court separately found that, even if Gold Reserve had remained a real "bidder," Elliott would still be the highest bidder because it offered judgment creditors the greatest balance of price and closing certainty. JA413. Whereas Gold Reserve's "financing structure [was] not sufficient to realistically deal with the risk posed by the 2020 Bondholders," Elliott's bid came "with a very high degree of closing certainty, thereby representing the best combination of price and certainty" of any bid "submitted at any point in the Sale Process." JA413-415.

The district court rejected the claim that Elliott's purchase price was grossly inadequate. JA395-397. Crediting Kleinrichert's valuation, the court found that the PDVH shares "have a fair market value of no

more than $10 billion," so the purchase price was far more than half the shares' value. JA373. Elliott's bid "extinguishes nearly $9 billion in Venezuelan debt"—almost $6 billion in judgments and $3 billion that PDVSA owed the Bondholders. JA414-415.

The district court further held that the sale process was "public" under 8 *Del. C.* § 324 because "discrete" periods of sealed bidding prevented neither the Venezuela Parties from viewing the bids nor any other interested bidders from accessing all relevant bid information at the end of each bidding round and submitting unsolicited superior bids. JA388-389. The court likewise dismissed the Venezuela Parties' unsubstantiated claims that the special master failed to consider alternative sale formats and found "no credible evidence" that the special master's or court's consideration of contingent liabilities "independently (or in any way improperly) reduced the value of the PDVH Shares." JA381-382, JA390.

The Venezuela Parties sought to stay the sale order pending appeal. The district court rejected their request but stayed the closing of the sale until seven days after the special master dockets a notice that all necessary regulatory approvals have been obtained and the sale is ready to close. JA424-425. After seeking a stay from this Court, the Venezuela

26

Parties asked in reply for the motion to be held until Elliott obtains all necessary regulatory approvals. This Court held their stay motion in abeyance and expedited the consolidated appeals from the sale order.

## SUMMARY OF ARGUMENT

I.     The district court correctly denied the motions to quash.

A.     The Venezuela Parties may not relitigate whether *Bancec* supplies the standard for attaching property held by a foreign instrumentality on an alter-ego theory. They extensively litigated both jurisdictional and substantive challenges to Crystallex's attachment, appealed from the order issuing the writ of attachment, and then lost when this Court affirmed the attachment in *Crystallex II*. Although the Venezuela Parties protest that they did not specifically argue in *Crystallex II* that Rule 69(a) incorporated state-law alter-ego principles, the mandate rule and collateral estoppel alike prevent them from relitigating old issues with new arguments.

B.     This effort to relitigate the alter-ego standard leads nowhere new because this Court correctly applied *Bancec*'s disjunctive control-or-fraud test in *Crystallex II*. The Venezuela Parties argue that the attachment is invalid because Rule 69(a) incorporates Delaware's conjunctive

control-and-fraud test.  But state law supplies only the *procedures* for attachment under Rule 69—not *substantive* alter-ego principles.  And even if Rule 69(a) did borrow forum-state alter-ego principles for conventional litigants, *Bancec* still would control whether a foreign instrumentality can shield assets from attachment by asserting a separate legal identity from its foreign sovereign because that test implements "a federal statute," Fed. R. Civ. P. 69(a)(1), and in any event would preempt Delaware's contrary standard under the Supremacy Clause.

II.    This Court should affirm the sale order.

A.    Elliott was the "highest bidder" for the PDVH shares.  8 *Del. C.* § 324(a).  Elliott was in fact the only "bidder" with a realistic ability to close because Gold Reserve did not have financing for its purportedly higher price.  Gold Reserve's bid also was not higher than Elliott's because all bidders were competing on both headline price and likelihood of closing.  Section 324 did not require the district court to choose a bid that was doomed to fail, had fallen apart by the sale hearing, and remained unfinanced on judgment day.

B.    The sale price was not grossly inadequate.  The $5.892 billion purchase price far exceeds 50% of the value of the PDVH shares, which

was $8.4-$8.6 billion under the expert analysis credited by the district court.  Because Delaware law allowed the court to consider the $3 billion in additional debt relief secured by Elliott's agreement with the Bondholders, there was no shortfall at all, much less the extreme inadequacy required to set aside a sale on appeal.

C.    The district court held a "public sale."  8 *Del C.* § 324(a).  The special master notified everyone who might be interested in acquiring CITGO that the PDVH shares were for sale.  Although purchase prices were confidential during bidding rounds, the special master publicized prices and other key bid terms after each round, and the district court structured the process to allow bidders to make superior bids at any time up until the sale order.

III.    The district court did not abuse its discretion in denying the disqualification motions.

A.    Parties must move for disqualification at the earliest opportunity.  Years before their eleventh-hour motions, Appellants knew that the special master retained advisors on the industry-standard condition that they could continue working on unrelated matters with potential bidders and other affected entities.  And months before their motions,

they knew that Weil had been retained on unrelated matters by Elliott and a holder of 2020 bonds. But they waited until the eve of the sale hearing to object that Weil and Evercore had *additional* unrelated matters with Elliott's affiliates and certain Bondholders, attempting to derail the sale process as it neared a conclusion that the Venezuela Parties and Gold Reserve sought to avoid. Having already rejected successive disqualification motions and cautioned against strategic delay, the district court had discretion to deny the disqualification requests as untimely and waived.

B.    The motions also were meritless. Under *In re Kensington International Ltd.*, 368 F.3d 289 (3d Cir. 2004) (*Kensington II*), recusal may be required under 28 U.S.C. § 455(a) for a "structural conflict." *Id.* at 304. The advisors' *unrelated* matters with Elliott, its affiliates, and certain Bondholders created no such conflict. Nor would a reasonable observer question the impartiality of the special master based on his advisors' work on unrelated issues in other cases. Although the Venezuela Parties also invoke the *per se* conflict rules in 28 U.S.C. § 455(b)(4), that provision does not allow imputation of advisors' conflicts to the district

judge or special master, and the advisors' unrelated matters do not qualify as conflicts under § 455(b)(4) in any event.

C.    Even if the special master should have recused himself based on his advisors' unrelated matters, the sale order still stands.  Appellants do not argue that the district judge was biased in any respect.  And the district court subjected the special master's actions to the rigors of the adversarial process and conducted its own evidentiary hearing and an independent review of all relevant legal and factual issues.  Because of that independent review, reasonable observers would not question the impartiality of the decision-making process that produced the sale order.*

## STANDARD OF REVIEW

This Court reviews the denial of the motion to quash for an abuse of discretion, *Wedgewood Vill. Pharmacy, Inc. v. United States*, 421 F.3d 263, 268 n.5 (3d Cir. 2005), the scope of its prior mandate de novo, *Cooper Distrib. Co. v. Amana Refrigeration, Inc.*, 180 F.3d 542, 546 (3d Cir.

---

   * To the extent not otherwise addressed in this brief, Crystallex adopts the arguments in the briefs filed by ConocoPhillips, Amber Energy, and the Four Creditors.  Fed. R. App. P. 28(i).

1999), and the application of estoppel for an abuse of discretion, *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995).

This Court reviews the district court's approval of the sale as a "discretionary judgment" subject to "deferential" abuse-of-discretion review. *Deibler v. Atl. Props. Grp., Inc.*, 652 A.2d 553, 558 (Del. 1995). The Court reviews any subsidiary factual findings for clear error. *Crystallex II*, 932 F.3d at 136.

This Court reviews the denial of disqualification motions for abuse of discretion. *United States v. Wecht*, 484 F.3d 194, 213 (3d Cir. 2007). The district court "'is in the best position to appreciate the implications of th[e] matters alleged in a recusal motion,' particularly when '[it] has presided over (i) an extraordinarily complex litigation (ii) involving a multitude of parties (iii) for an extended period of time.'" *United States v. Ciavarella*, 716 F.3d 705, 720 (3d Cir. 2013).

## ARGUMENT

## I. The Writs Of Attachment Are Valid

The Venezuela Parties argue that Delaware alter-ego law governs the validity of the attachments by Venezuela's creditors as if this Court had not already affirmed Crystallex's attachment under *Bancec*'s federal-

common-law standard in *Crystallex II*.  Their contrary narrative that the earlier appeal concerned only the district court's jurisdiction is revisionist history.  The Venezuela Parties cannot re-air their objection to the attachment of the PDVH shares.  And that objection is meritless anyway.

## A. The Venezuela Parties May Not Relitigate Challenges To The Attachments

Because the Venezuela Parties litigated and lost their challenge to Crystallex's attachment in this Court under the federal-law standard for disregarding a foreign instrumentality's separate identity, the mandate in *Crystallex II* bars the Venezuela Parties' renewed challenge to Crystallex's attachment, and collateral estoppel further prevents the Venezuela Parties from relitigating the proper standard in the attachment context for other creditors.

1.    This is not the first time the Venezuela Parties have peddled the position that Crystallex must prove fraud to attach the PDVH shares.  "Before it lost its prior appeal to this Court, PDVSA conceded that 'the legal standard for alter-ego . . . applied in this case [is] federal common law.'"  *Crystallex III*, 24 F.4th at 247 n.2.  That standard came from *Bancec*, where the Supreme Court held that "instrumentalities of a for-

33

eign state" have an "independent status" except when (1) the instrumentality "is so extensively controlled by its [sovereign] that a relationship of principal and agent is created" or (2) recognition of the instrumentality's separate legal identity "'would work fraud or injustice.'" 462 U.S. at 627-29. According to PDVSA, *Bancec* did not authorize attachment of property held by a foreign instrumentality on an alter-ego theory without a separate jurisdictional basis and, to the extent it did, *Bancec* at least required proof of fraud or injustice. *Crystallex II*, 932 F.3d at 138-41.

Rejecting PDVSA's arguments, this Court held that *Bancec* applies in attachment proceedings and reiterated that "*Bancec* establishes a disjunctive test" requiring proof of *either* "extensiv[e] control" *or* "'fraud.'" *Crystallex II*, 932 F.3d at 139-40. The Court upheld the writ of attachment under the first theory, remarking that, "if the relationship between Venezuela and PDVSA cannot satisfy the Supreme Court's extensive-control requirement, we know nothing that can." *Id.* at 152.

On remand, the Venezuela Parties changed their tune. They moved to quash the writ of attachment on the theory that Rule 69(a) required Crystallex to prove PDVSA was Venezuela's alter ego under *Delaware* law. *Crystallex III*, 24 F.4th at 247-48. This motion understandably gave

the district court a "sense of déjà vu." *Id.* at 247.  Invoking both estoppel principles and its "obligation to comply with the appellate mandate," the district court denied the motion.  JA104.

The Venezuela Parties' contention (Br. 39) that *Crystallex II* only "adjudicated PDVSA's interlocutory appeal of the denial of its FSIA immunity under the collateral-order doctrine" is demonstrably false. PDVSA appealed from *both* the "denial of PDVSA's motion to dismiss as an immune sovereign *and* the grant of Crystallex's motion for a writ of attachment under Federal Rule of Civil Procedure 69." *Crystallex II*, 932 F.3d at 136 (emphasis added).  While hearing the sovereign-immunity appeal under the collateral-order doctrine, this Court separately exercised jurisdiction over the order issuing the writ of attachment as "a final judgment under 28 U.S.C. § 1291." *Id.*  The Court has since twice recognized that *Crystallex II* "affirmed the District Court's orders, *including the writ of attachment*." *Crystallex III*, 24 F.4th at 247 (emphasis added); *see OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 164 (3d Cir. 2023) (*OIEG*).

The Venezuela Parties contend (Br. 38-39) that they can take another crack at the attachment because they did not invoke Rule 69(a) in

*Crystallex II* as the basis for applying Delaware law.  But on remand, parties may not "seek to inject arguments about the proper test that they did not pursue" on appeal.  *Bondi v. VanDerStok*, 604 U.S. 458, 467 n.2 (2025).  This rule preserves the hierarchy of appellate review, leaving the district court without "'jurisdiction to alter the mandate of this court on the basis of matters included *or includable* in [a] prior appeal.'"  *Taylor v. Comm'r of Pa. Dep't of Corr.*, 150 F.4th 188, 191 n.4 (3d Cir. 2025) (emphasis added).  Regardless of label, "[a]ffirmance on an appeal actually taken . . . concludes a common issue that otherwise would arise in continuing proceedings, whether the theory be issue preclusion or law of the case."  18 Wright & Miller, *Federal Practice and Procedure* § 4418 (3d ed. Sept. 2025 update).

Insisting that they could not have raised the attachment's validity in *Crystallex II*, the Venezuela Parties seize (Br. 40-41) on the statement in *OIEG* that "[r]esolution of the immunity issue"—whether PDVSA had sovereign immunity from suit—"does not dictate the outcome of the attachment issue."  73 F.4th at 176.  But this Court said only that it lacked pendent jurisdiction to review "whether PDVSA's property can be attached to pay out a judgment," an inquiry that implicates not only *Bancec*

but also, for example, the FSIA's in-commerce requirement.  *Id.* at 175-76; *see* pp. 11-12, *supra*.  Unlike in *Crystallex II*, the Venezuela Parties did not invoke the final-judgment rule in *OIEG* because the district court only *conditionally* granted writs of attachment pending a change in OFAC policy or further instruction from the court, JA10582-10583, whereas there was "'nothing left to do but execute'" Crystallex's pre-sanctions attachment, 932 F.3d at 136.

The Venezuela Parties' insinuation (Br. 43-44) of a bait and switch is baseless.  Although Crystallex argued that the district court could leave full adjudication of the alter-ego standard for a motion to quash, D. Ct. Dkt. 70 at 2-4, PDVSA objected, JA1680-1682, refused to accept only a "definitive immunity ruling before proceeding to the merits," Venezuela Br. 44, and "vigorously litigated all issues," JA106.  The court then decided the alter-ego issue in granting Crystallex's motion for a writ of attachment, JA1773-1775, and asked PDVSA whether it expected to "seek to quash the writ" based on "additional evidence," JA1812.  PDVSA provided "no indication" that it "would seek to quash the writ based on Delaware law or on any other basis," so the court "proceeded to issue the writ."  JA106-107.  No one suggested that the Venezuela Parties could

take *another* run at the attachment on *another* alter-ego theory *after* an appeal.

2.   The district court also correctly held in its *Tidewater* decision that collateral estoppel precludes the Venezuela Parties from relitigating the proper standard in other judgment creditors' attachment proceedings.  JA221-229.  A federal judgment precludes relitigation of an issue if "'(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action.'"  *Henglein v. Colt Indus. Operating Corp.*, 260 F.3d 201, 209 (3d Cir. 2001).

The order granting Crystallex's motion for a writ of attachment meets each requirement.  The parties previously, actually, and necessarily litigated whether *Bancec* governed whether the PDVH shares were subject to attachment as Venezuela's property.  The district court was "unpersua[ded]" by PDVSA's invocation of "Delaware state law," applied *Bancec*, and issued a writ of attachment based on "extensive control" without requiring proof of fraud.  JA1759, JA1776-1792.  That order "amounted to a final judgment" that this Court affirmed on appeal.

*Crystallex II*, 932 F.3d at 136.  The Venezuela Parties also were fully represented at all times and do not challenge the district court's ruling that PDVH and CITGO were in privity with PDVSA and are precluded to the same extent.  JA102-104.  Collateral estoppel requires no more.

The Venezuela Parties protest (Br. 38-39) that they did not specifically argue that Rule 69 incorporates state-law alter-ego principles in *Crystallex II*.  As with the mandate rule, a party cannot evade collateral estoppel by repackaging an already-rejected position—here, that an attachment requires proof of fraud—in new wrapping paper.  The district court correctly recognized that, "[o]nce an issue is raised and determined, it is the entire *issue* that is precluded, not just the particular arguments raised in support of it in the first case."  JA225 (quoting *Alevras v. Tacopina*, 226 F. App'x 222, 231 (3d Cir. 2007)); *accord Del. River Port Auth. v. Fraternal Order of Police*, 290 F.3d 567, 578 n.22 (3d Cir. 2002) (citing Restatement (Second) of Judgments § 27 cmt. c (1982)).

At any rate, the Venezuela Parties *did* oppose Crystallex's writ of attachment on the theory that "the [district court] must undertake an alter ego analysis 'in accordance with Delaware law,'" under which "'alter ego liability applies only in the rare circumstance where the corporate

39

form is abused to perpetrate a fraud against the plaintiff.'" JA224 (quoting JA1529-1531). A new Rule 69 label does not allow the Venezuela Parties to resurrect an old argument after they litigated Crystallex's attachment to a final judgment—and lost.

### B. *Bancec* Governs The Attachment Of Property Held By A Foreign Instrumentality On An Alter-Ego Theory

The Venezuela Parties also would gain nothing by relitigating whether Crystallex and other judgment creditors had to make a showing of fraud under Delaware law to attach the PDVH shares on an alter-ego theory. As a matter of circuit precedent, *Crystallex II* establishes that *Bancec* governs a foreign instrumentality's ability to oppose attachment based on a separate legal identity from a foreign sovereign. The Venezuela Parties attempt (Br. 26-35) to sneak around *Crystallex II* through a purported backdoor in Rule 69(a). But that provision borrows only the forum state's execution *procedures*—not its substantive alter-ego law. And even if Rule 69 did generally adopt the forum state's alter-ego principles in typical cases, that incorporation of state law could not override the federal standard in *Bancec*.

1.    Rule 69 nowhere signals a bold ambition to devolve onto the States the authority to adopt 50 different standards for attaching assets

nominally held by a foreign instrumentality to pay a foreign sovereign's debts. Rather, that provision plays a garden-variety role in directing district courts to borrow "the *procedure* of the state where the court is located" in judgment-enforcement proceedings. Fed. R. Civ. P. 69(a)(1) (emphasis added). Judgment creditors may "use any execution *method* consistent with the practice and procedure of the State in which the district court sits." *Peacock v. Thomas*, 516 U.S. 349, 359 n.7 (1996) (emphasis added). The district court thus looked to Delaware law for the appropriate writ (here, *fieri facias*), the types of attachable property (the debtor's shares in a company, even if held by a third party), and the sale process. JA1743, JA1812; *see* JA232.

In borrowing procedures from the forum state, Rule 69 does not control the *substantive* question whether the PDVH shares, though nominally owned by PDVSA, are Venezuela's property on an alter-ego theory. The reference to "procedure of the state" is "significant limiting language" confirming (to state the obvious) that Rule 69(a)(1) "incorporates only local *procedure*." *Weinstein v. Islamic Republic of Iran*, 831 F.3d 470, 480 n.18 (D.C. Cir. 2016), *abrogated on other grounds*, *Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018).

41

Nor could Rule 69 stray into substantive territory. Arguing that Rule 69 requires application of forum "state law to *all* dispositive questions" in judgment-enforcement proceedings, the Venezuela Parties criticize the district court for "distinguish[ing] procedure from substance." Br. 26, 28 (emphasis added). But that is Congress's distinction, not the district court's. The Rules Enabling Act provides that the Federal Rules "shall not abridge, enlarge or modify any substantive right." 28 U.S.C. § 2072(b). Adopting forum law as the rule of decision for all issues related to attachment would impermissibly displace the ordinary choice-of-law analysis for substantive issues. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941). This Court should reject the Venezuela Parties' expansive interpretation of Rule 69(a) "in order to 'minimiz[e] potential conflict with the Rules Enabling Act.'" *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 503 (2001).

Like other substantive issues concerning who owns what property, whether an entity can shield property from attachment by asserting a separate legal identity from the judgment debtor "is determined generally by state law, save that on rare occasions overriding federal law may control this determination or bear upon it." *Segal v. Rochelle*, 382 U.S.

375, 381 n.6 (1966). *Bancec* is a preeminent example of overriding federal law for disputes concerning a foreign instrumentality's relationship with its foreign sovereign.

In *Bancec*, Cuba had expropriated all of Citibank's Cuban assets, and its state-run bank, Bancec, piled on by suing Citibank in New York federal court to recover on a letter of credit. 462 U.S. at 614-15. The question before the Supreme Court was "which body of law determines the effect to be given to Bancec's separate juridical status" for purposes of a substantive issue: Citibank's attempt to offset the (much larger) value of its expropriated assets against Bancec's claim. *Id.* at 621. Squarely rejecting reliance on either Cuban law or forum-state law, the Court formulated a federal rule based on principles "common to both international law and federal common law." *Id.* at 621-23 & n.11. Both the presumption of corporate separateness and its two exceptions for extensive control and injustice rest on decisions developing alter-ego principles as a matter of federal law. *Id.* at 628-29 (citing, *inter alia*, *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402-04 (1960)).

That federal-law standard applies equally to attachment as to offset. In *Crystallex II*, this Court rejected the Venezuela Parties' attempt

43

"to restrain the application of *Bancec* in post-judgment proceedings." 932 F.3d at 139. The consequence is that, "so long as PDVSA is Venezuela's alter ego under *Bancec*, the District Court had the power to issue a writ of attachment on that entity's non-immune assets to satisfy the judgment against the country." *Id.* Delaware's "procedure on execution" simply has nothing to say about whether a Venezuelan instrumentality can assert a separate legal existence from Venezuela. Fed. R. Civ. P. 69(a)(1).

*Bancec* forecloses the Venezuela Parties' suggestion (Br. 34) that alter-ego status is either a procedural issue covered by Rule 69(a) or a substantive issue for which "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 1606. Section 1606 is "silent" as to "the rule governing the attribution of liability *among* entities of a foreign state," *Bancec*, 462 U.S. at 622 n.11, as well as the rule for when "property held by one agency is really property of another," *id.* at 628. Parties thus may not "circumvent *Bancec*" as to alter-ego issues in attachment proceedings even if state or foreign law might apply to other substantive aspects of property ownership in FSIA cases. *EM Ltd. v. Republic of Argentina*, 473

44

F.3d 463, 479-80 (2d Cir. 2007); *see, e.g.*, *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.*, 183 F.3d 1277, 1284-89 (11th Cir. 1999).

The Venezuela Parties identify *zero* cases that analyzed a foreign instrumentality's juridical separateness from a foreign sovereign under state law for *any* purpose.  In *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 313 F.3d 70 (2d Cir. 2002), for example, the Second Circuit applied forum law under Rule 69(a)(1) in holding that New York procedures allowed attachment of a debtor's property interests even if held by a third party, *id.* at 83, before applying Indonesian law to determine whether the foreign instrumentality owned the attached funds, *id.* at 88.  And in *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010), the Ninth Circuit applied forum procedure in holding that the district court could not order a foreign sovereign to reassign a right to payment from third-party debtors residing overseas. *Id.* at 1131.  Neither case supports applying forum law to decide whether PDVSA is Venezuela's alter ego, and *Karaha*'s application of Indonesian law to property ownership conflicts with the Venezuela Parties' position, as they come close to conceding (Br. 31).

The Venezuela Parties also are wrong to portray (Br. 27-28) Crystallex as having urged application of Delaware's alter-ego standard in *Crystallex II*.  Crystallex looked to Delaware law for the *procedure*— garnishment of stock owned by the judgment debtor either directly or in the name of its alter ego.  Br. 30-32, *Crystallex II*, *supra* (citing *Kingsland Holdings, Inc. v. Bracco*, 1996 WL 104257, at *1, 6-7 (Del. Ch. Mar. 5, 1996)); *accord Mackey v. Lanier Collection Agency & Serv., Inc.*, 486 U.S. 825, 834 & n.10 (1988).  Crystallex then identified *Bancec* as the "controlling decision" for the substantive determination whether "PDVSA is Venezuela's alter ego."  Br. 43, *Crystallex II*, *supra*.  From day one, Crystallex observed the procedural/substantive line that Rule 69(a)(1) adopts and the Rules Enabling Act mandates.

The Venezuela Parties' interpretation of Rule 69(a) conflicts even with decisions not involving foreign sovereigns.  In *IFC Interconsult, AG v. Safeguard International Partners, LLC*, 438 F.3d 298 (3d Cir. 2006), this Court borrowed execution procedures from forum (Pennsylvania) law, *id.* at 311, but applied out-of-state (Delaware) law under an agreement's choice-of-law provision in deciding that the judgment creditor could garnish property held by a third party, *id.* at 318-20.  Like *Karaha*,

*IFC* cannot be reconciled with the Venezuela Parties' contention (Br. 29-30) that Rule 69 incorporates forum law to decide whether a judgment debtor has an interest in a given asset that can be attached.

The Venezuela Parties cite (Br. 27) a series of cases allowing parties outside the foreign-sovereign context to attach property under Rule 69(a) on an alter-ego theory without analyzing whether ordinary choice-of-law principles or Rule 69(a) dictated the test for disregarding an entity's separate corporate identity. When courts grapple with choice of law, they identify the applicable alter-ego test through the forum state's choice-of-law principles, not Rule 69(a)(1). *E.g.*, *Citibank, N.A. v. Aralpa Holdings Ltd. P'ship*, 714 F. Supp. 3d 416, 433-39, 447 (S.D.N.Y. 2024), *aff'd*, 2025 WL 289499 (2d Cir. Jan. 24, 2025); *Christiansen v. Mech. Contractors Bid Depository*, 404 F.2d 324, 325 & n.3 (10th Cir. 1968) (citing *Erie R.R. v. Tompkins*, 304 U.S. 64 (1938)).

The upshot is that, in Rule 69 attachment proceedings as any other, federal courts resolve substantive issues by following federal law where applicable and otherwise selecting state law using ordinary choice-of-law

principles. In *Crystallex II*, this Court properly affirmed the writ of attachment under the *Bancec* standard without superimposing an *additional* layer of alter-ego analysis under Delaware law.

2. Even if Rule 69 required courts to apply forum-state alter-ego principles to conventional litigants, *Bancec* still would supply the rule of decision for foreign sovereigns and their instrumentalities. Rule 69 itself disclaims any attempt to override federal law. If any doubt remained, the Supremacy Clause would dictate that *Bancec* prevails over any conflicting rule of Delaware law.

To begin with, Rule 69 does not apply when "a federal statute governs" the issue. Fed. R. Civ. P. 69(a)(1). The Venezuela Parties object (Br. 34) that "*Bancec* is not a federal statute." But *Bancec* "is a federal common-law outgrowth of [a] specialized statute." *Crystallex II*, 932 F.3d at 139. The FSIA states that certain "property in the United States of a foreign state . . . shall not be immune from attachment in aid of execution, or from execution." 28 U.S.C. § 1610(a). Applying the statute, the Supreme Court and this Court have held that "the judgment holder may reach the assets of the foreign judgment debtor by satisfying the *Bancec*

factors" for treating property held by a foreign instrumentality as property of the foreign state. *Crystallex II*, 932 F.3d at 139 (citing *Rubin*, 583 U.S. at 213).  The FSIA expressly—or at a minimum "implicit[ly]"—authorizes attachment and execution under such circumstances and prevents Delaware law from negating *Bancec* on the back end.  *Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 143 n.3 (2014).

Even aside from that express carveout, *Bancec* would preempt contrary Delaware law.  The Venezuela Parties argue (Br. 35) that "Rule 69 displaces *Bancec*" with Delaware law.  But they get things backward.  The incorporation of state procedure under Rule 69(a) "must not thwart the supremacy of federal law." *Arnold v. Blast Intermediate Unit 17*, 843 F.2d 122, 125 (3d Cir. 1988).  Nor does Rule 69(a) "'spea[k] *directly*'" to a foreign instrumentality's separate legal identity, as required to displace a federal-common-law rule like *Bancec*. *Am. Electric Power Co. v. Connecticut*, 564 U.S. 410, 424 (2011) (emphasis added).  As a result, the Supremacy Clause leaves no Delaware alter-ego standard for foreign instrumentalities that Rule 69(a) could borrow.  JA234; *see Boyle v. United Techs. Corp.*, 487 U.S. 500, 504 (1988).

Allowing a foreign instrumentality like PDVSA to assert an independent existence under state law in opposing attachment would fracture the uniformity that *Bancec* ensures. A foreign instrumentality's juridical separateness is among the "matters bearing on the Nation's foreign relations [that] 'should not be left to divergent and perhaps parochial state interpretations.'" 462 U.S. at 622 n.11 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964)). The Constitution's commitment of "relations with foreign nations" to the federal government alone means that "a federal rule of decision is 'necessary to protect uniquely federal interests.'" *Texas Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640-41 (1981) (quoting *Sabbatino*, 376 U.S. at 426). States could not countermand *Bancec* with a more stringent alter-ego standard and thereby impede the federal government's "disposition of foreign assets." *Weinstein*, 831 F.3d at 481 n.19; *see, e.g.*, *United States v. Belmont*, 301 U.S. 324, 331-32 (1937).

However this Court approaches the issue, the Venezuela Parties' efforts to manufacture a twilight zone for state-law alter-ego principles in attachment proceedings against foreign sovereigns conflict with *Bancec* and *Crystallex II*.

50

## II.    There Is No Basis To Disturb The District Court's Sale Order On Appeal

The district court correctly applied the sale procedures—issues for which Rule 69(a) *did* incorporate Delaware law.  Elliott was the highest (and only) bidder for the PDVH shares.  Its bid paid fair value for the shares.  And the court accepted that bid only after a public sale—one whose publicity is unrivaled in the history of forced judicial sales.  Appellants fall short in establishing an abuse of discretion in any respect.

### A.    The Sale Complied With Delaware's Highest-Bidder Requirement

The district court found that Elliott was the "highest bidder" for the PDVH shares under 8 *Del. C.* § 324(a).  As the Venezuela Parties concede (Br. 67), this Court reviews that determination for an abuse of discretion, asking only whether the district court "exceeded the bounds of reason in view of the circumstances" or "so ignored recognized rules of law or practice so as to produce injustice." *Deibler*, 652 A.2d at 558.  Appellants come nowhere close to making that showing.

1.    The district court correctly determined that, at the time of the sale order in November 2025, Gold Reserve's bid was "no longer a Qualified Bid" because it was not "backed by committed financing" and had no

means to satisfy senior judgment creditors.  JA413.  All agree that a person is not a "bidder" under § 324 simply because it floats a multi-billion-dollar price that it cannot actually pay.  Gold Reserve Br. 33; JA10336 n.35 (Venezuela Parties).  Under Delaware law, a party that does "not produce a valid financing commitment" is "properly disqualified from bidding" and cannot be considered "the highest bidder." *Vornado PS, L.L.C. v. Primestone Inv. Partners, L.P.*, 821 A.2d 296, 316 (Del. Ch. 2002).  The district court's sale procedures accordingly required a bid to contain "proof of financing commitments if needed to consummate the Sale Transaction."  JA3149; *see* JA3290.

That makes sense:  "[A] price is not high or even real if it can't actually be paid at closing" to judgment creditors.  JA13422.  For example, Black Lion Capital Advisors, LLC, submitted an $8 billion bid, JA5916, and Blue Water Venture Partners, LLC, submitted a $10 billion bid, JA393.  No one disputes that the court properly declined to consider those bids, even though they had higher headline prices than both Elliott's and Gold Reserve's, because they were subject to "financing contingencies." JA319, JA393.

Financing also tripped up Gold Reserve's bid. From the outset, its financing plan was shaky. Gold Reserve, a junior judgment creditor, did not have on hand anywhere close to the amount of cash necessary to satisfy senior creditors' judgments. JA288 (priority order). After credit bidding its judgment and senior judgments held by Koch and Rusoro, Gold Reserve still needed $4.5 billion in debt financing that required a merger of its acquisition vehicle, Adolin, with CITGO so that the loan would be "secured by liens on the assets of CITGO and its subsidiaries." D. Ct. Dkt. 1602-1 at 5-6; JA341-342.

Crystallex immediately pointed out the fatal flaw in Gold Reserve's bid: If the Bondholders "prevail in litigation," they could "prevent the merger between CITGO Petroleum and [Adolin] that is at the heart of Gold Reserve's Bid." D. Ct. Dkt. 1658 at 3-4. The high headline price of Gold Reserve's bid would be "irrelevant as the deal would not close, and no Attached Judgment Creditors would be paid." *Id.* at 4. When the special master recommended Gold Reserve, Crystallex and other creditors renewed the objection that the bid "presents an unacceptable risk that judgment creditors will not be paid if the bid is approved." JA6699; *see* JA6687-6690 (ConocoPhillips); JA6692 (ACL); JA6720 (OIEG).

Those predictions came true. The Southern District of New York's decision upholding the Bondholders' collateral interest in 50.1% of CITGO Holding "turned out to pose a deadly threat to the Dalinar Bid"— *i.e.*, Gold Reserve's bid. JA350; *see* pp. 17-19, *supra*. Because that bid's financing structure "essentially be[t] on a finding of [the bonds'] invalidity," it was eminently foreseeable (and had in fact been foreseen) that the Southern District's contrary decision would "doom the Gold Reserve Bid to failure, given the structure of its financing." JA416. Gold Reserve has only itself to blame for setting a ticking time bomb that blew up in its face.

Gold Reserve insists (Br. 35-37) that the district court wrongly mandated a settlement with the Bondholders after ordering that the model purchase agreement "will not include any requirement or condition with respect to the 2020 Bond Entities." JA5557. But the court consistently "'reject[ed] any suggestion that a Final Bid must include a settlement with the 2020 Bondholders'" because "'[t]here are numerous ways'" to address this risk—*e.g.*, a bidder could avoid the risk entirely by financing the purchase price with cash or loans that were not secured by CITGO's assets. JA310. *Gold Reserve* is the one that forced the issue

back into the case by sticking with a financing structure that the Bond-holders could block.  JA9595-9596.  Because Elliott and Gold Reserve both relied on debt financing secured by CITGO's assets, the district court properly gave weight to Elliott's "voluntary decision to reach [a Bondholder] settlement as one way of addressing" its closing certainty vis-à-vis Gold Reserve's.  JA5875.

Gold Reserve also blames (Br. 34-35) the implosion of its bid on the district court for authorizing the special master to execute a sale pur-chase agreement with Amber that supposedly violated a court-ordered $50 million overbid minimum.  But "[i]t is 'peculiarly within the province of the district court . . . to determine the meaning of its own order.'" *Truskoski v. ESPN, Inc.*, 60 F.3d 74, 77 (2d Cir. 1995).  The special master retained "discretion to lower the overbid minimum amount for subse-quent bids," which the court found "helpful for reasons including that '*the evaluation criteria include criteria other than price*'"—namely, closing certainty.  JA5618, JA5639 (emphasis added).  The district court acted well within its discretion in concluding that the special master was not limited to "considering only bids that have a headline price at least $50 million greater."  JA13422.  If Gold Reserve's bid could not survive the

"ministerial action" of terminating the proposed purchase agreement, the court observed, then "the Dalinar bid was never one that was going to prevail on the merits anyway." JA13423.

Gold Reserve ignores that it could have remained in the competition even after the special master switched his recommendation to Elliott's bid. The district court emphasized that the termination of the Gold Reserve's proposed purchase agreement to align with the switch in recommendation "was not meant to displace the financing supporting the Dalinar Bid," preserved Gold Reserve's ability to "obtai[n] committed financing" and "make an unsolicited new bid that it believes is superior to Amber Energy's bid," and did not "prevent the Court from considering the Dalinar Bid as a potentially winning bid." JA409, JA13423-13424. But Gold Reserve sat on its hands and urged the court on the final day of the sale hearing to declare it the winner in the hope that, "in the event the Court approves the Dalinar bid," *then* "the commitments will be able to be put back in place." JA13826. Gold Reserve's inability to resubmit a financed bid after the Southern District's decision "confirm[ed] the precarious nature of the Dalinar Bid, from which it ha[d] apparently suffered all along." JA410.

Still, Gold Reserve protests (Br. 35) that it "remains capable of following through on its bid." But "[i]t's not guaranteed," as Gold Reserve was quick to caveat in the district court. JA13826. Such speculation places Gold Reserve in the same position as Black Lion and Blue Water, who all agree were not serious bidders. Appellants do not challenge the district court's factual finding that Gold Reserve lacked committed financing or explain how the district court could have abused its discretion in selecting the only financed bid before it. Delaware law did not require the district court to choose Gold Reserve's speculative and unfinanced bid over Elliott's fully financed bid, thereby forcing judgment creditors to wait and see whether Gold Reserve might be able to pay them—or instead whether the sale process would have to be relaunched at great expense and further delay.

Gold Reserve is wrong to suggest (Br. 20-21) that the district court's decision depends on whether the Second Circuit upholds the Bondholders' pledge. All that matters for abuse-of-discretion review is "the state of the record at the time" of the district court's decision. *Lilly v. State*, 649 A.2d 1055, 1060 (Del. 1994). Gold Reserve at the time was not a legitimate bidder *at all*, because it consciously elected not to submit a

fully financed bid, as required.  Because Elliott was the only bidder with the present ability to pay its purchase price, the district court did not abuse its discretion in determining that Elliott was necessarily the highest bidder.  JA413.

2.    Even if Gold Reserve had remained a viable bidder at the time of the sale order, the district court did not abuse its discretion in determining that Elliott would have been the highest bidder.

Delaware courts prioritize bids that are likely to deliver the greatest value to creditors and have not rigidly interpreted the term "highest bidder" as the person who purports to offer the highest headline price. When bidders are "competing along more dimensions than just price," "certainty of financing and favorable deal terms [are] legitimate factors . . . to consider when choosing the winning bidder." *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *14 & n.135 (Del. Ch. Nov. 1, 2013); *see, e.g.*, *Lawsky v. Condor Cap. Corp.*, 2015 WL 4470332, at *9 (S.D.N.Y. July 21, 2015).  Gold Reserve's own case (Br. 30-31) clarifies that, when it is "'legally essential' to approve the highest offer," comparing bids based only on headline price "assumes that the offers and offerors are in

all other respects comparable." *In re Bakalis*, 220 B.R. 525, 533 (Bankr. E.D.N.Y. 1998) (emphasis omitted).

The district court had discretion to select as the winning bid the one that offered the highest value to judgment creditors through the "best balance" of price and closing certainty (JA5873)—while providing billions of additional debt relief to PDVSA.  Because the Bondholders hold a security interest in 50.1% of the shares of CITGO Holding, there always was significant risk that they "would be able to disrupt the Dalinar Sale Transaction, either by voting their shares of CITGO Holding to block the Adolin-CITGO merger (which is fundamental to the Dalinar Bid) or by seeking an injunction against that transaction."  JA411.  The district court did not abuse its discretion in determining that Gold Reserve's "financing structure is not sufficient to realistically deal with the risk posed by the 2020 Bondholders," whereas "the Amber Bid comes with a very high degree of closing certainty, thereby representing the best combination of price and certainty" and making it the highest bidder under § 324. JA413-415.  For those reasons, "the expected value of the Dalinar Bid is less than that of the Amber Bid, given the significantly greater non-closing risk associated with the Dalinar Bid."  JA349.

The district court's determination that Elliott's bid offered the highest value to judgment creditors at the time of the sale hearing likewise does not depend on the Second Circuit's ruling on the bonds' validity. *Lilly*, 649 A.2d at 1060. Delaware law "tasked" the district court "with resolving the parties' disputes as they presently exist, based on all that is known today," and "[a]s of today, the 2020 Bonds are valid." JA418. "[E]ven if the Second Circuit reverses the SDNY in the 2020s Litigation," the court did not abuse its discretion in finding that the record, "based only on all that can be known now, favor[ed] approval" of Elliott's bid. JA419.

## B.    The Sale Price Was Not Grossly Inadequate

The Venezuela Parties also contend (Br. 69) that the sale price was so "grossly inadequate" that it "shocks the conscience" under Delaware law. Nothing about the $5.892 billion purchase price—to say nothing of the billions of additional value to PDVSA—is shocking, particularly under the deferential standard of review.

Delaware follows the "well-established rule" that "mere inadequacy of price, standing alone, is an insufficient ground for setting aside a judicial sale." *Burge v. Fid. Bond & Mortg. Co.*, 648 A.2d 414, 419 (Del. 1994).

A dissatisfied party must show that "the sales price is so grossly inadequate that it shocks the conscience of the court" under "the particular circumstances of the individual case." *Id.* Delaware courts have a rule of thumb that a sale for less than 50% of an asset's fair market value is subject to "special judicial scrutiny." *Id.*

The Venezuela Parties are wrong to portray (Br. 67) the 50% standard as a rigid and unyielding rule. Delaware courts do not "inflexibly" impose 50% as an "absolute" floor. *Girard Tr. Bank v. Castle Apartments, Inc.*, 379 A.2d 1144, 1145-46 (Del. Super. Ct. 1977) (confirming sale for "less than 6% of the fair market value"); *see, e.g.*, *Deibler*, 652 A.2d at 559 (affirming sale for "somewhat less than 50% of the fair market value"). Instead, Delaware courts developed the standard for "moderately priced properties" that are expected to generate "widespread buying interest" and preserve more play in the joints for trial courts to oversee sales of "property whose price is great or usefulness is limited." *Girard*, 379 A.2d at 1146. The Venezuela Parties do not challenge *any* of the factual findings underlying the district court's determination that "CITGO cannot be fairly characterized by anyone as a 'moderate[ly] price[d] . . . property'"; the universe of potential buyers "consists of perhaps 100 to 200 entities";

and "contingent liabilities, including the Alter Ego Claims and 2020s Litigation" as well as sanctions and "the vigor with which the Venezuela Parties are fighting to prevent the Sale Process from being concluded successfully," limit the available buyers of the PDVH shares.  JA397.

The purported 50% standard does not help the Venezuela Parties anyway.  As the district court found, Elliott's $5.892 billion purchase price easily clears a 50% bar because the PDVH shares' market value is "under $10 billion."  JA352-373.  The parties "were far apart in their estimations of the fair value of" the PDVH shares.  *Deibler*, 652 A.2d at 559.  While the Venezuela Parties' expert offered an outlandish valuation of $18.6 billion, Red Tree's expert provided a valuation "between $8.4 and $8.6 billion, before considering contingent liabilities."  JA352.  The court rejected the $18.6 billion valuation as "non-credible and unpersuasive" because the projections were "unduly optimistic," at times "more than 25-40% higher than CITGO management's [historically overstated] projections," and "result in a 'highly flawed and unreliable' analysis that significantly inflated CITGO's fair market value."  JA368-369, JA391.  In contrast, the court found the $8.4-$8.6 billion valuation—which "adjust[ed] CITGO's cash flow projections downwards" for its "historical underperformance"—

to be "well-supported in the record and persuasive." JA355, JA361, JA365.

The Venezuela Parties never confront these factual findings, much less argue clear error. For good reason: The district court's "decision to credit the testimony" of Red Tree's expert over the Venezuela Parties' "can virtually never be clear error." *Anderson v. Bessemer City*, 470 U.S. 564, 575 (1985); *see, e.g.*, *Allied Erecting & Dismantling Co. v. U.S. Steel Corp.*, 2024 WL 2318162, at *2-3 (3d Cir. May 22, 2024). And the valuation that the district court credited is far closer to the $7.25 billion that, in September 2023, PDVH itself represented in Delaware Chancery Court as its shares' "fair-market equity value," JA4276-4277, before pivoting to an astronomical figure that was *over $10 billion higher* when objecting to the sale.

The Venezuela Parties retreat (Br. 67-68) to a preliminary $13.2 billion valuation that Evercore prepared in 2023. But they again identify no clear error in the district court's finding that the estimate was "not a fair measure of the value of the PDVH Shares today" because it was "outdated," "contain[ed] errors," and was based on optimistic projections that

"CITGO significantly underperformed" in the real world.  JA372.  Although the Venezuela Parties quibble (Br. 68) that Evercore should have updated its 2023 preliminary assessment, they ignore that the shares were thoroughly marketed with no one offering anything remotely close to the value they claim, and that the *parties* presented experts to resolve valuation through an adversarial process.  Nothing in Delaware law prevented the district court from considering the market reality and adopting the Red Tree valuation without commissioning another Evercore valuation too.

Abandoning their 50% rule, the Venezuela Parties insist (Br. 68-69) that the purchase price shocks the conscience "under any valuation" (*i.e.*, $8.4-$8.6 billion) because Elliott's bid was "*billions* of dollars below" the PDVH shares' value.  But they do not challenge the district court's factual finding that no such shortfall exists because Elliott's bid "extinguishes nearly $9 billion in Venezuelan debt" by eliminating significant contingent liabilities that PDVSA owes to the Bondholders.  JA414-415.  Delaware law authorized the district court to consider these "financial benefits" to the Venezuela Parties in analyzing the sale price's adequacy.  *Deibler*, 652 A.2d at 559-60.

Even if the district court could not consider the extinguished contingent liabilities, the $5.892 billion price hardly shocks the conscience. The Venezuela Parties' own witnesses could not think of "anyone" willing to pay "even $10 billion" for the PDVH shares, admitted that the sale was "extensively marketed," and conceded that there was "no 'concrete evidence'" that rerunning the sale process would result in "a higher bid than what has been offered to date."  JA371, JA374.  As the district court noted, no genuine bid ever "exceeded $8 billion."  JA393.  Gold Reserve approached that amount only by ignoring the existential threat the Bondholders' success posed to its financing.  *See* p. 54, *supra*.

Venezuela cannot complain (Br. 69) about losing a "crown jewel" when it expropriated billions, stiffed judgment creditors for almost a decade, and effectively encumbered that crown jewel with massive debts that drove down the price bidders were willing to pay.  JA115.  Given the unique challenges facing a purchaser of the PDVH shares—contingent liabilities, sanctions, and the Venezuela Parties' scorched-earth resistance to any sale—"the only legitimate evidence of [CITGO's] value at the time it is sold" is "the foreclosure-sale price itself."  *BFP v. Resol. Tr. Corp.*, 511 U.S. 531, 548-49 (1994).  The Venezuela Parties have not

proved that potential bidders were somehow unaware of this highly public sale process or that a higher bid would be likely at a subsequent sale. *Girard*, 379 A.2d at 1146.  Delaware law does not set a minimum price that no one is willing to pay.

## C.    The Sale Was Public

The Venezuela Parties next argue (Br. 70-71) that the district court did not hold a "public sale."  8 *Del C.* § 324(a).  But the court oversaw an incredibly public sale.  A sale is public when there is "public notice" of an opportunity to participate.  "Sale," *Black's Law Dictionary* (12th ed. 2024).  The special master repeatedly posted notices of the sale in major Delaware, U.S. national, and Venezuelan newspapers.  JA10705-10724.

The Venezuela Parties argue (Br. 70-71) that the sale was not "public" because bidders did not know the price of competing bids until the end of each bidding round—a feature, they say, that "inevitably suppressed the sale price."  But the bidding process provided multiple "full opportunit[ies] to know what the competition is and to increase [a] bid." *Offredi v. Huhla*, 60 A.2d 779, 781 (Conn. 1948).  The special master publicly disclosed each bid's key terms—including price—every time he "rec-

ommended a bid to the Court." JA388. This design stimulated competition both inside and outside bidding rounds because bidders were incentivized during rounds to outbid the highest competing bid they thought likely and still retained an opportunity "to submit an Unsolicited Competing Proposal *after* a final round bid was recommended and its terms made public, *just as Amber Energy did*." JA388 (emphases added). Section 324 does not require a "live auction" where all bidders know all bid prices in real time. JA388.

## III. The Disqualification Requests Were Baseless

With no credible challenge to the sale order, Appellants surfaced a late-blooming disqualification theory. Venezuela Br. 45-59; Gold Reserve Br. 40-53. Appellants' disqualification motions marked "the fourth and fifth times a party" had unsuccessfully moved to disqualify the special master or his advisors in this case—including three prior efforts by the Venezuela Parties. JA10415. Having superintended this long-running litigation for nearly a decade, Judge Stark rightly rejected Appellants' tired tactic and denied the motions as untimely, waived, and meritless. Appellants identify nothing close to reversible error.

## A.    The Motions Were Untimely And Waived

The disqualification motions were procedurally improper.  JA10419.  Appellants knew since 2021 that the special master's advisors could work on matters with market participants unrelated to the sale process under the express terms of their retention agreements.  Appellants also knew since March 2025 of the advisors' prior, unrelated work with Elliott and certain Bondholders.  But Appellants did not seek to disqualify the special master or his advisors based on any unrelated representations *until September 2025*—and only as the sale process approached a resolution Appellants hoped to avoid.

1.    Appellants did not seek disqualification "in a timely manner." *Kensington II*, 368 F.3d at 312.  "'The judicial process can hardly tolerate the practice of a litigant . . . holding back'" allegations of bias "'while calling upon the court for hopefully favorable rulings, and then seeking recusal when they are not forthcoming.'"  *Id.*  To forestall such "strategic" concealment, *In re Kensington Int'l Ltd.*, 353 F.3d 211, 222 (3d Cir. 2003) (*Kensington I*), a disqualification motion "must be brought at the earliest possible moment after obtaining knowledge of facts demonstrating the basis for such a claim," *Omega Eng'g, Inc. v. Omega S.A.*, 432 F.3d 437,

448 (2d Cir. 2005) (quotation marks omitted).  "[P]ervasive" constructive notice can be "tantamount to actual knowledge" and trigger the duty to object.  *Kensington II*, 368 F.3d at 314.  The district court thus warned that, if any party perceived "meritorious grounds for disqualifying the special master," that concern was "an emergency" requiring the party to contact the court "within a day, two days maybe, three days at most." JA3546; *see* JA4526-4528.

Appellants did not do so here.  From the sale process's inception, all parties knew—and, at minimum, had pervasive constructive notice— that the special master's advisors could maintain unrelated relationships with potential bidders and other transaction participants.  JA10428- 10429.  When the district court approved the special master's engage- ment of Weil and Evercore in 2021, the special master entered retention agreements expressly permitting the advisors to work on unrelated mat- ters with entities that were or might become involved in the sale pro- cess—including "potential parties to any transaction."  JA2526; *see* JA10428.  Appellants do not dispute the district court's finding that those provisions were industry standard.  JA10428.  Having objected to *other* aspects of the Evercore retention agreement at length, JA2641-2643, the

Venezuela Parties cannot seriously contend that they were unaware of the unrelated-representations provision. Gold Reserve does not dispute (Br. 56) that it was aware. Over the next four years, however, no party objected to the potential for unrelated representations.

Appellants also knew of the advisors' prior engagements with Elliott *months* before they moved for disqualification. In March 2025, PDVH, CITGO, and Gold Reserve learned from the special master's discovery responses that Weil and Evercore had previously performed unrelated work for Elliott and a Bondholder. JA10420-10421. As they admit, Venezuela and PDVSA learned of Weil's engagements by no later than August 6, 2025, when the special master's discovery responses were introduced as an exhibit at the deposition of Evercore director William Hiltz. JA10393, JA12784-12785. Again, no one objected or even sought further discovery on those issues.

Appellants cried foul only as the proceedings reached their last act at the sale hearing in September—*after* it became clear that momentum favored the recommended Elliott bid. JA330. As the district court found, Appellants had every incentive to stymie the sale process. JA10426-10427. PDVH's counsel confessed that his clients were seeking to "resist

the sale," JA13665, and Gold Reserve's CEO testified that losing its bid

would be "existential" to its future, JA10426.  Gold Reserve also admit-

tedly made (Br. 54) the deliberate "decision not to move for disqualifica-

tion" based on the special master's disclosures in March and maintained

at the sale hearing that conflicts would taint the sale only if the district

court "started to rule" in Elliot's favor—not in Gold Reserve's favor.

JA13047.  With a front-row seat to serial disqualification motions, Judge

Stark did not abuse his discretion in concluding that the serious "risk" of

gamesmanship justified denying the belated motions.  *In re Int'l Bus.*

*Machs. Corp.*, 45 F.3d 641, 643 (2d Cir. 1995); *see, e.g.*, *Nat'l Auto Brokers*

*Corp. v. Gen. Motors Corp.*, 572 F.2d 953, 958-59 (2d Cir. 1978) (affirming

denial of recusal motion where allegedly disqualifying representation

"had been known to . . . counsel for months").

The Venezuela Parties seek to excuse (Br. 60) Venezuela's and

PDVSA's delay by contending that only PDVH and CITGO received the

special master's March 2025 disclosures.  But *all* parties had constructive

notice of the potential for unrelated representations since the advisors'

retention agreements were executed *in 2021*.  And both Venezuela and

PDVSA would have learned of the specific Weil-Elliott representations

by no later than August 6, 2025, at the Hiltz deposition. *See* p. 70, *supra*. Neither Venezuela nor PDVSA objected at either juncture.

Appellants claim that grounds for disqualification became apparent only after the deposition of Elliott's in-house counsel, Michael Turkel, and the special master's subsequent supplemental disclosures of additional, unrelated representations of Elliott affiliates by Weil and Evercore in September 2025. Venezuela Br. 60; Gold Reserve Br. 54-55. But Appellants' own disqualification theory defeats that claim. If the advisors' unrelated representations presented a *per se* conflict, Venezuela Br. 48, they presented such a conflict *regardless of* the "terms, timing, and revenue" involved, JA10425, JA10430. As the district court concluded, "the fact, rather than extent, of the representation," was the "pertinent issue." JA10425. The court did not abuse its wide discretion in holding that the later disclosures were immaterial to timeliness.

The Venezuela Parties' claims (Br. 53-54, 62) of "[c]oncealment" likewise fall flat. As the district court explained, the special master's March 2025 discovery responses fully disclosed Weil's representations of Elliott, JA10423-10424, and his supplemental September disclosures addressed Elliott's *affiliates* once Appellants "expanded the previously-

72

sought discovery" to request that information, JA10425-10426.  The Venezuela Parties also charge (Br. 54) as "untrue" Weil's statement that it had not represented any *"bidde[r] . . . since the start of the stalking horse period."* But that truthful statement again concerned *Elliott*, not Elliott's *affiliates*.  JA10422 (emphasis added).

The Venezuela Parties deny (Br. 62) any "gamesmanship."  But the district court was not required to take them at their word and "blind" itself to their repeated resort to the disqualification playbook, JA10465, and candid desire "to resist the sale," JA13665.  Appellants have not shown any abuse of discretion.

2.     Appellants independently waived any right to seek recusal based on an appearance of bias under § 455(a).  *Kensington I,* 353 F.3d at 220-21; JA10427-10430.  By 2021, Appellants knew—or at least were on constructive notice—of Evercore's retention agreement expressly permitting unrelated business relationships with entities that were or might become involved in the sale process.  *See* pp. 69-70, *supra*.  In contemporaneously objecting to other provisions of that agreement while failing to object to the unrelated-representations provision, Appellants waived any challenge to potential unrelated representations.  *See, e.g.*, *Frank v. Colt*

73

*Indus., Inc.*, 910 F.2d 90, 92 (3d Cir. 1990) (finding waiver based on failure to raise challenge to provision in prior proceedings).

Appellants counter (Venezuela Br. 63-64; Gold Reserve Br. 56) that they did not review any unrelated-representations provision in *Weil's* agreement, but that industry-standard provision was materially identical in both agreements. JA2526; JA10428. Appellants offer no reason why that provision would have been objectionable for Weil, but not for Evercore. The Evercore agreement thus "suffic[ed] to put . . . counsel on notice" of the same issue in Weil's agreement. *United States v. Nobel*, 696 F.2d 231, 236 (3d Cir. 1982); *see Goldman Sachs & Co. v. Athena Venture Partners, L.P.*, 803 F.3d 144, 148-49 (3d Cir. 2015). The district court did not abuse its discretion in deeming any objection waived.

## B. The District Court Correctly Found That There Was No Basis For Disqualification

The disqualification motions are also meritless. The district court did not abuse its discretion in holding that the Appellants failed to demonstrate either an appearance of impropriety, 28 U.S.C. § 455(a), or a disqualifying financial interest, *id.* § 455(b)(4).

1.    Section 455(a) compels disqualification only upon a showing that a judicial officer's "impartiality might reasonably be questioned,"

28 U.S.C. § 455(a), by a "'reasonable observer who is informed of all the surrounding facts and circumstances,'" *Ciavarella*, 716 F.3d at 723; *see Cheney v. U.S. District Court*, 541 U.S. 913 (2004) (Scalia, J., mem.). Appellants advance the theory that a reasonable observer would question the special master's impartiality because his advisors supposedly had a disqualifying "conflict of interest." *Kensington II*, 368 F.3d at 303. If no such conflict exists, however, the "inquiry comes to an end." *Id.*

Judicial officers are "presum[ed]" to be unbiased, and the party seeking disqualification bears the "burden" of rebutting that "presumption." *Schweiker v. McClure*, 456 U.S. 188, 195-96 (1982). The required showing is especially demanding when, as here, the movant seeks to establish a conflict in a "massive proceeding" after the court has already "invested substantial judicial resources." *Martin v. Monumental Life Ins. Co.*, 240 F.3d 223, 237 (3d Cir. 2001).

a.    The district court acted well within its discretion in finding that Weil and Evercore's unrelated representations did not raise a disqualifying conflict of interest. JA10442-10454. That conclusion flows from the settled distinction between disqualifying conflicts and ordinary, unrelated professional relationships. A "structural conflict" arises when

a judicial advisor attempts to perform two contrary undertakings that involve "the same legal issues." *Kensington II*, 368 F.3d at 304. But a court does not "abus[e] its discretion" in holding that a judicial officer's relationships for "matters unrelated to the present case d[o] not warrant disqualification." *Westinghouse Electric Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1322 (7th Cir. 1978); *accord Auto Brokers*, 572 F.2d at 958.

*Kensington II* illustrates the basic distinction. There, a district court retained lawyers to assist in an asbestos bankruptcy while the same lawyers simultaneously represented tort claimants in a closely related asbestos-driven bankruptcy presenting "the same disputed issues" on which they were privately advising the judge. 368 F.3d at 295-96, 302. There was "a substantial likelihood"—even a tacit understanding—that the lawyers' clients in the other bankruptcy proceeding would assert claims in the *Kensington* proceeding. *Id.* at 299. That "close relationship between the future asbestos claimants and the issues" in the *Kensington* proceeding gave rise to a disqualifying "structural" conflict. *Id.* at 304.

Appellants' reliance (Venezuela Br. 52-53; Gold Reserve Br. 52-53) on *Kensington II* thus backfires. Whereas the advisors there had "a fiduciary duty to advance" the "interests" of asbestos claimants by "tak[ing]

positions" that "favored" their clients in a related bankruptcy proceeding, 368 F.3d at 304, the special master here did "not owe fiduciary or other duties to any of the Parties, or to the creditors of any Parties," JA2445. Weil's and Evercore's engagements with market participants concerned entirely different transactions and issues—creating no incentive or obligation to advance any party's position in the PDVH sale.  JA10038, JA10181, JA10453.  And unlike the advisors' recommendations in *Kensington*, Weil's and Evercore's recommendations were "heavily scrutinized and subject to an objections process" by all interested parties. JA3019.  The absence of any disqualifying conflict alone "end[s]" the inquiry.  *Kensington II*, 368 F.3d at 303.

Regardless, the district court also acted well within its discretion in concluding that a reasonable, informed observer would not "question the impartiality of the Special Master or his Advisors" based on unrelated representations.  JA10439.  This proceeding was "unique in terms of its scale, complexity, duration, cost, and other respects," such that "[e]very move by the Special Master was scrutinized" and "[e]very party had ample opportunity to object."  JA9683, JA10439.  To succeed, the process

necessarily required expertise from sophisticated legal and financial advisors like Weil and Evercore, whose "experience must include familiarity and interaction with, and almost certainly retention by, the types of entities that would have the means and interest to bid on a company like CITGO." JA10464.

Against that backdrop, no reasonable observer could question the special master's impartiality based on his advisors' unrelated representations of Elliott and certain Bondholders. The representations were a miniscule fraction of Weil's and Evercore's engagements. Elliott affiliates, for instance, paid Weil approximately $4.5 million over the last five years—"constituting less than 0.05%" of Weil's revenues and "immaterial" when compared to Weil's compensation in this case ($39.4 million), much less compared to its multibillion-dollar annual revenue. JA10452, JA10457-10458. In the same period, Evercore received $25 million from an ad hoc group of which Elliott was only one member, an amount "dwarfed" by Evercore's nearly $3 billion in annual revenue. JA10452. Those fees, understood in context, would not cause a reasonable observer to question the special master's impartiality.

b.    Appellants mischaracterize the facts and do not come close to demonstrating that the district court abused its discretion in deeming any conflict immaterial.

Gold Reserve cobbles together (Br. 43) a headline figure of $170 million that the advisors earned from the purportedly disqualifying engagements.  As the district court explained, that misleading figure is made up "entirely of fees earned by the Advisors in matters *unrelated* to the Sale Process," often paid by affiliates or ad hoc groups rather than the bidders themselves.  JA10451.  The Venezuela Parties' factual recitation (Br. 19) confirms that Weil, for instance, collected a far smaller fee—approximately $4.5 million over the last five years—from Elliott itself.

Because this number "pales" against Weil's "multibillion dollar annual revenue," JA10436, Appellants turn to the economic motives of "individual lawyers," Venezuela Br. 55-56, and Weil more generally, Gold Reserve Br. 43-44.  But those motives are irrelevant.  Courts have rejected the "unrealistic" assumption that a firm necessarily shares a substantial financial interest in any case "in which any [firm] partner" is interested—an assumption especially unrealistic for a firm of Weil's size. *Pashaian v. Eccelston Props., Ltd.*, 88 F.3d 77, 83 (2d Cir. 1996).  Weil's

generalized interest in future business opportunities applied to all bidders and Sale Process Parties, past client or not.

Appellants next purport to identify (Venezuela Br. 50; Gold Reserve Br. 44) smoking-gun communications between Weil and Elliott.  On the eve of the topping-bid deadline, Turkel contacted Jeffrey Saferstein, a Weil partner who represented Elliott in unrelated matters and had no role advising the special master.  Turkel was frustrated that Elliott was unable to submit a conforming topping bid before the court-ordered deadline.  JA10444.  Saferstein relayed that frustration internally and asked one of the special master's advisors to speak with Turkel—precisely the kind of bidder outreach the advisors routinely undertook.  JA10444.  The advisors reiterated to Turkel that the deadline was fixed by court order, that non-conforming bids would be rejected, that they could not alter bid requirements or compel counterparties to negotiate, and that Elliott (like all bidders) could submit an unsolicited bid later.  JA10444-10445.

The district court correctly deemed those communications "obviously innocuous":  "They are routine communications on their face, and they do not exhibit any greater or specialized access Elliott had to the Special Master's Advisors than that available to any other bidder (or Sale Process

Party)." JA10447. As Gold Reserve concedes (Br. 45), those communications were simply "to ensure that the [a]dvisors at Weil were responsive" in explaining bid procedures, as they would be to any other bidder. Nothing changed because of these communications. Appellants offer "no evidence of prejudice," only "fanciful illusion." *Martin*, 240 F.3d at 237.

Appellants also claim (Venezuela Br. 20; Gold Reserve Br. 23) that Evercore recognized in an email that advising Elliott could be a "huge issue." JA12703. But the email related to an unrelated deal, and the supposed issue was *not* a conflict with these proceedings. Evercore—which is known for its shareholder activism defense practice, JA12952-JA12953—was discussing whether the deal involved Elliott's "distressed fund" or its "activism fund," because "other important clients" on that deal might be adverse to Elliott's activism fund. JA12703. Saying that Appellants take this email out of context would be charitable.

Appellants' claims (Venezuela Br. 51-52; Gold Reserve Br. 48-51) that bias explains the special master's judgments likewise collapse under scrutiny. Adverse "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States*, 510 U.S.

540, 555 (1994).  The special master consistently applied the court's evaluation criteria and engaged with bidders even-handedly.  As the Venezuela Parties admit (Br. 51), Elliott "lost more frequently than it prevailed" during the bidding process.  JA10448-10449.  Elliott could make the winning bid only by agreeing to pay substantial fees to Red Tree and Gold Reserve as part of its unsolicited bid.  JA10449.  Had the special master's advisors ignored Elliott based on the sort of speculative conflicts Appellants now allege, the creditors may well have been left with no viable bidder at all when Gold Reserve's financing predictably unraveled.

2.    The Venezuela Parties' solo efforts to demonstrate a disqualifying financial interest under § 455(b)(4) fare no better.

a.    To start, § 455(b)(4) compels judges—and through Rule 53, special masters—to recuse based only on their own disqualifying financial interests:  A judge must recuse if "he, individually or as a fiduciary, or his spouse or minor child residing in his household, has" a disqualifying interest.  28 U.S.C. § 455(b)(4); *see* Fed. R. Civ. P. 53(a)(2).  No one contends that Judge Stark or the special master held any such interest.

The Venezuela Parties attempt to impute Weil's and Evercore's purported interests to the special master.  But § 455(b) does not authorize

82

such imputation.  To the contrary, the express enumeration of imputable interests—those held by the judge's "spouse" or resident "minor child"—forecloses any broader imputation.  *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 616-17 (1980) (*expressio unius* canon).  A judicial advisor's financial interests may occasionally cause a reasonable observer to question the judge's or special master's own impartiality under § 455(a) or Rule 53.  *See In re Allied-Signal Inc.*, 891 F.2d 967, 969-72 (1st Cir. 1989) (Breyer, J.) (analyzing judicial employee's potential financial conflict only under § 455(a)); *accord Kensington II*, 368 F.3d at 294.  But the Venezuela Parties cite no authority imputing such interests to a court or special master under § 455(b) and Rule 53.

b.     In any event, the Venezuela Parties have not shown that Weil and Evercore had either (1) the required "financial interest" "in a party to the proceeding" or (2) "any other interest that could be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(4).

First, Weil and Evercore hold no qualifying "financial interest"—"a relationship as director, adviser, or other active participant in the affairs of a party."  28 U.S.C. § 455(d)(4).  As the district court concluded, Weil's

and Evercore's unrelated legal and financial work does not constitute active participation in the affairs of Elliott or any Bondholder.  JA10457.

The Venezuela Parties insist (Br. 58) that Weil and Evercore are literally "adviser[s]" to Elliott and certain Bondholders.  28 U.S.C. § 455(d)(4).  But no competent English speaker would say an outside lawyer gains a "financial interest in" a company by sporadically offering legal advice.  *Bond v. United States*, 572 U.S. 844, 861 (2014) (rejecting interpretation that would create "dissonance between" "ordinary meaning of a defined term" and "reach of the definition").  Such a "broad" interpretation would give "adviser" a meaning "inconsistent with" its statutory neighbors—"director" and "other active participant."  *Fischer v. United States*, 603 U.S. 480, 487 (2024) (*noscitur a sociis* canon).  In grouping those terms together, Congress limited the set of qualifying "adviser" relationships to formal, internal roles in a party's affairs.  Weil and Evercore undisputedly held no such roles here.

Second, the district court did not abuse its discretion in concluding that the special master and his advisors held no "other interest" that could "be substantially affected by the outcome of the proceeding."  28 U.S.C. § 455(b)(4).  Courts consider "the remoteness of the interest and its extent

or degree." *United States v. Stone*, 866 F.3d 219, 229 (4th Cir. 2017).

Applying that principle, Chief Justice Rehnquist declined to recuse from

an antitrust case involving Microsoft even where his son's law firm rep-

resented Microsoft in *related* matters because a decision's potential effect

on his son's representations was too "speculative." *Microsoft Corp. v.

United States*, 530 U.S. 1301, 1302 (2000). The mere "possibility of gar-

nering future fees as a result of their work in [the] Sale Process" here is

likewise "far too 'remote, contingent, and speculative' to give rise to a

need to disqualify." JA10456-10458 (quoting *Hook v. McDade*, 89 F.3d

350, 356 (7th Cir. 1996)).

## C. Any Purported Conflict Would Not Warrant Vacatur Of The Sale Order

The purported conflicts also would not justify "vacating the sale and

redoing the process." Venezuela Br. 24. Appellants do not "claim that

either [Special Master] Pincus or Judge Stark was non-neutral." Gold

Reserve Br. 51. Where an undisputedly impartial court conducts "inde-

pendent review and determination of the relevant legal [and factual] is-

sues," this Court deems any alleged conflicts "harmless." *Selkridge v.

United of Omaha Life Ins. Co.*, 360 F.3d 155, 171-72 (3d Cir. 2004); *see,

e.g.*, *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 862

(1988) (holding that "harmless error" review is available under § 455); *TransPerfect Holdings LLC v. Pincus*, 2025 WL 1691473, at \*4 (3d Cir. June 17, 2025); *Marcavage v. Bd. of Trs. of Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 232 F. App'x 79, 84 (3d Cir. 2007).

That rule controls here.  "Each of the Special Master's major decisions was scrutinized by . . . the Court itself," after public disclosure and vetting through a rigorous objections process.  JA10442.  Judge Stark closely shaped, directed, and controlled the sale process from its inception.  He approved the initial sale procedure order only after *seven* iterations.  JA3276.  And he routinely rejected the special master's recommendations, including both the initial bid recommendation and a proposal to enjoin alter-ego litigation by certain creditors of the Venezuela Parties. JA299-300.  Far from simply "choosing between" bids presented by the special master, Venezuela Br. 57, Judge Stark responded to the special master's initial recommendation by directing him to "effectively restar[t] the bidding process" with new procedures, JA300.  The court also adopted its own evaluation criteria to structure the special master's recommendations and repeatedly guided the special master on their application.

Over three years, Judge Stark issued opinions pertaining to the sale process that spanned hundreds of pages—based on his review of thousands of pages of briefing—in a highly transparent and iterative process.

The record thus belies the Venezuela Parties' characterization (Br. 56-57) of the district court's role as "limited."  Any purported taint by the special master's advisors—two steps removed from Judge Stark— had no effect on the court's even-handed administration of the sale process.

Unable to distinguish this Court's harmless-error cases, *e.g.*, *Selkridge*, 360 F.3d at 171-72, the Venezuela Parties rely (Br. 56) on out-of-circuit cases.  But those cases are far afield.  Some involve conflicted judicial advisors whose findings were subject to "clear error" review.  *Jenkins v. Sterlacci*, 849 F.2d 627, 631-32 (D.C. Cir. 1988).  Others concern "adjudicative" decision-making tainted by "unchecked and uncheckable" recommendations.  *E.g.*, *In re Brooks*, 383 F.3d 1036, 1045-46 (D.C. Cir. 2004) (special master made findings based on improper ex parte investigative contacts).  Those cases bear no resemblance to the independent judicial administration of a highly public and transparent sale process here.

# CONCLUSION

The Court should affirm.

February 9, 2026

Respectfully submitted,

Robert L. Weigel
Rahim Moloo
Jason W. Myatt
Zachary Kady
Vanessa Ajagu
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-4000

Raymond J. DiCamillo
Jeffrey L. Moyer
Travis S. Hunter
RICHARDS, LAYTON & FINGER, P.A.
1 Rodney Square 920 N. King St.
Wilmington, DE 19801
(302) 651-7700

*/s/ Miguel A. Estrada*
Miguel A. Estrada
  *Counsel of Record*
Lucas C. Townsend
Jeffrey Liu
Brian C. McCarty
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC 20036
(202) 955-8500

Patrick J. Fuster
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Plaintiff-Appellee Crystallex International Corporation*

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that at least one attorney whose name appears on this brief is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

February 9, 2026

*/s/ Miguel A. Estrada*
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC  20036
(202) 955-8500

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 16,996 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point New Century Schoolbook font.

3.      This brief complies with this Court's Rule 31.1(c) because the text of the electronic brief is identical to the text of the paper document, and because the document has been scanned with version 7.29.20108.0 of CrowdStrike Falcon Sensor and is free of viruses.

February 9, 2026

*/s/ Miguel A. Estrada*
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC  20036
(202) 955-8500

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of February 2026, I caused the foregoing brief to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the Court's CM/ECF system.  I further certify that service was accomplished on all parties via the Court's CM/ECF system.

February 9, 2026

*/s/ Miguel A. Estrada*
Miguel A. Estrada
GIBSON, DUNN & CRUTCHER LLP
1700 M Street, N.W.
Washington, DC  20036
(202) 955-8500