Nos. 25-3347, 25-3348, 25-3349, 25-3350, 25-3363, 25-3564, 25-3455, 25-3476, 25-3465, 25-3486, 25-3468, 25-3489

───────────────────────────────

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

───────────────────────────────

CRYSTALLEX INTERNATIONAL CORPORATION,

*Plaintiff-Appellee*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

───────────────────────────────

On Appeals From The United States District Court
For The District of Delaware
No. 1:17-mc-151-LPS, Judge Leonard P. Stark (sitting by designation)

───────────────────────────────

## BRIEF OF CONOCOPHILLIPS APPELLEES

GARRETT B. MORITZ
KEVIN A. RUDOLPH
ROSS ARONSTAM & MORITZ LLP
1313 N. Market Street, Suite 1001
Wilmington, DE  19801
(302) 576-1600

MARCUS J. GREEN
MICHAEL S. KIM
KOBRE & KIM LLP
800 Third Avenue, 6th Floor
New York, NY  10022
(212) 488-1200

AMY R. WOLF
RICHARD G. MASON
MICHAEL H. CASSEL
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

*Counsel for ConocoPhillips Appellees*

February 9, 2026

---

TIDEWATER INVESTMENT SRI, ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

---

OI EUROPEAN GROUP, B.V.,

*Plaintiff-Appellee*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

---

PHILLIPS PETROLEUM COMPANY VENEZUELA LTD., ET AL.,

*Plaintiffs-Appellees*,

v.

PETROLEOS DE VENEZUELA S.A., ET AL.,

*Defendants-Appellants.*

---

NORTHRUP GRUMMAN SHIP SYSTEMS INC.,

*Plaintiff-Appellee*,

v.

MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

---

CONTRARIAN CAPITAL MANAGEMENT LLC, ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

---

ACL1 INVESTMENTS LTD., ET AL.,

*Plaintiffs-Appellees,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

RUSORO MINING LTD.,

*Plaintiff-Appellee,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

RED TREE INVESTMENTS LLC,

*Plaintiff-Appellee,*

v.

PETROLEOS DE VENEZUELA S.A., ET AL.,

*Defendants-Appellants.*

KOCH MINERALS SARL, ET AL.,

*Plaintiffs-Appellees,*

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

CONOCOPHILLIPS GULF OF PARIA B.V.,

*Plaintiff-Appellee,*

v.

CORPORACION VENEZOLANA DEL PETROLEO, ET AL.,

*Defendants-Appellants.*

---

XYQ US, LLC,

*Plaintiff-Appellee/Appellant*,

v.

PETROLEOS DE VENEZUELA S.A., ET AL.,

*Defendants-Appellants*.

---

GOLD RESERVE INC.,

*Plaintiff-Appellee/Appellant*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants*.

---

CONOCOPHILLIPS PETROZUATA B.V., ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants*.

---

VALORES MUNDIALES S.L., ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants*.

---

RUDI LOVATI, ET AL.,

*Plaintiffs-Appellees*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants*.

---

---

GRAMERCY DISTRESSED OPPORTUNITY FUND LLC,

*Plaintiff-Appellee*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

---

SAINT-GOBAIN PERFORMANCE PLASTICS EUROPE,

*Plaintiff-Appellee*,

v.

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL.,

*Defendants-Appellants.*

---

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Third Circuit LAR 26.1, the ConocoPhillips Appellees hereby make the following disclosure:

A.  ConocoPhillips Company is a wholly owned subsidiary of ConocoPhillips, which is publicly traded.

B.  ConocoPhillips Petrozuata B.V. is a wholly owned subsidiary of Conoco Orinoco Inc., which is a wholly owned subsidiary of ConocoPhillips Company, which is a wholly owned subsidiary of ConocoPhillips, which is publicly traded.

C.  ConocoPhillips Hamaca B.V. is a wholly owned subsidiary of Phillips Petroleum International Investment Company LLC, which is a wholly owned subsidiary of Phillips Investment Company LLC, which is a wholly owned subsidiary of ConocoPhillips Company, which is a wholly owned subsidiary of ConocoPhillips, which is publicly traded.

D.  ConocoPhillips Gulf of Paria B.V. is a wholly owned subsidiary of Conoco Petroleum Operations Inc., which is a wholly owned subsidiary of Burlington Resources LLC, which is a wholly owned subsidiary of ConocoPhillips Company, which is a wholly owned subsidiary of ConocoPhillips, which is publicly traded.

E.  ConocoPhillips has no parent corporation, and no publicly held corporation owns ten percent or more of its stock. ConocoPhillips is the indirect owner of ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V., and ConocoPhillips Gulf of Paria B.V.  ConocoPhillips is the parent company of ConocoPhillips Company.

# TABLE OF CONTENTS

**Page**

TABLE OF CITATIONS .......................................................................iv

INTRODUCTION.................................................................................1

STATEMENT OF RELATED CASES ....................................................4

STATEMENT OF ISSUES....................................................................5

STATEMENT OF THE CASE ..............................................................5

      A.    ConocoPhillips' Property is Expropriated by
           Venezuela...............................................................................5

      B.    ConocoPhillips Registers its Judgments and is
           Named a Sale Process Party...............................................6

      C.    The Gold Reserve and Amber Bids Compete at
           the Sale Hearing..................................................................8

      D.    Amber's Bid is Selected, and Gold Reserve
           Appeals...............................................................................12

SUMMARY OF ARGUMENT ..............................................................12

STANDARD OF REVIEW....................................................................14

ARGUMENT ......................................................................................15

   I.    The District Court Permissibly Considered Closing
        Risk in Evaluating Gold Reserve's Bid.................................15

   II.    Gold Reserve and XYQ's Challenges to the District
        Court's Findings Are Unpersuasive. ....................................18

      A.    The District Court Correctly Found that the 2020
           Bondholders Posed a Crippling Risk to Gold
           Reserve's Bid. ....................................................................19

B.    The District Court Correctly Found that Amber's Bid Was Financed in a Realistic Manner...................... 24

C.    The District Court Was Not Required to Select Gold Reserve's Bid and, Once the Bid Failed, Hold a Re-Do Auction Later. ......................................... 26

CONCLUSION ........................................................................27

# TABLE OF CITATIONS

**Page(s)**

## Cases

*Arnold* v. *Soc'y for Sav. Bancorp.*,
   650 A.2d 1270 (Del. 1994)....................................................... 17

*Bufkin* v. *Collins*,
   604 U.S. 369 (2025)................................................................. 15

*ConocoPhillips Petrozuata BV* v. *Bolivarian Republic of*
   *Venezuela*,
   2024 WL 4986937 (3d Cir. Dec. 5, 2024) ......................... 6, 7

*DFC Global Corp.* v. *Muirfield Value Partners, L.P.*,
   172 A.3d 346 (Del. 2017)........................................................ 18

*In re Appraisal of Regal Ent. Grp.*,
   2021 WL 1916364 (Del. Ch. May 28, 2021) ........................ 18

*Marblegate Asset Mgmt., LLC* v. *Education Mgmt. Corp.*,
   846 F.3d 1 (2d Cir. 2017) ....................................................... 25

*U.S. Bank N.A. ex rel. CWCapital Asset Management LLC* v.
   *Village at Lakeridge, LLC*,
   583 U.S. 387 (2018)................................................................. 15

*Wilkinson* v. *United States*,
   131 F.4th 134 (3d Cir. 2025)................................... 14, 15, 18

## Statutes and Rules

8 *Del. C.* § 324............................................................... 5, 12, 15

28 U.S.C. § 2111 ........................................................................ 23

Fed. R. App. P. 28(i) .................................................................. 2

Fed. R. Civ. P. 52(a)(6) ............................................................ 15

Fed. R. Civ. P. 61..................................................................... 23

Fed. R. Civ. P. 69(a)................................................................... 2

## INTRODUCTION[1]

Almost twenty years ago, the Bolivarian Republic of Venezuela expropriated ConocoPhillips'[2] interests in three major oil projects in that country. ConocoPhillips has been seeking redress for Venezuela's taking of its property ever since. Having obtained multiple arbitration awards and judgments against Petróleos de Venezuela S.A. ("PDVSA"), Venezuela's state-owned oil company, and the Bolivarian Republic of Venezuela itself, totaling billions of dollars, payment of which Venezuela has attempted to evade at every turn, ConocoPhillips became the largest creditor in the judgment enforcement proceedings below.

Together with Crystallex and the Venezuela Parties, ConocoPhillips served in the district court as a "Sale Process Party"—parties appointed by the district court to work closely with the court-appointed special master and his advisors to design and implement the sale process, almost certainly the largest and most complex judicial sale ever conducted outside of a bankruptcy proceeding.

---

[1] Capitalized terms not otherwise defined have the same meanings as in Crystallex's brief.

[2] The ConocoPhillips Appellees are ConocoPhillips Petrozuata B.V., ConocoPhillips Hamaca B.V., Phillips Petroleum Company Venezuela Limited, and ConocoPhillips Gulf of Paria B.V.

ConocoPhillips' two judgments to be paid through the sale are directly against PDVSA, not the Republic.[3]  The writs of attachment that secure those judgments thus are not subject to Venezuela's appeal with respect to Rule 69(a), and ConocoPhillips does not address those issues in detail.  However, ConocoPhillips concurs in the position of the other Appellees that the Venezuela Parties' contention that Delaware law governing legal separateness between a Delaware-incorporated entity and its shareholders governs the legal separateness of the Venezuelan government and its Venezuelan-law instrumentality lacks support in either case law or logic.  It is unfathomable why Delaware-law principles developed for ordinary corporations, rather than federal law, to which the regulation of foreign policy is assigned, should regulate the relationship between a foreign sovereign and its instrumentalities.

Otherwise, and to minimize duplicative briefing, ConocoPhillips joins in Crystallex's brief with respect to the disqualification issue and the objections to the sale.  *See* Fed. R. App. P. 28(i).  ConocoPhillips

---

[3] As described below, ConocoPhillips has a third judgment against the Republic, but that judgment is not receiving a recovery due to its position in the priority order.

submits this brief to address certain matters regarding Appellants' objections to the selection of Amber Energy as the winning bidder.

Gold Reserve and XYQ's position is that "highest bid" under Delaware law means "once the Special Master deems a bid qualified, the only permissible criterion for selection of a bid is the highest 'headline price.'" That rule has no support in Delaware law. A bid that is subject to an unlikely-to-be-satisfied set of contingencies is necessarily much less valuable—in other words, much *lower*—than a bid that has fewer or no contingencies. The district court was entitled to consider whether Gold Reserve's bid could close or should be heavily discounted due to risks inherent in the bid.

Beyond that issue, Gold Reserve and XYQ's appeals amount to a challenge to the district court's discretionary determinations and factual findings made, following a four-day evidentiary hearing, by a court that has tirelessly presided over this enormously complex matter for almost a decade. And those challenges to the district court's detailed findings— which defeat Gold Reserve and XYQ's appeals—are entirely unpersuasive under any standard of review, let alone abuse of discretion or clear error. The district court correctly found that Gold Reserve's bid

either needed to be heavily discounted, or was not actionable, because it was dependent on the 2020 Bondholders losing their litigation (they won instead) or on Gold Reserve's fantastical notions about OFAC and the Southern District of New York restraining the Bondholders' exercise of their pledge while their collateral value is destroyed by Gold Reserve securing billions of dollars of acquisition financing with the assets of CITGO.  The district court was also justified in finding that Amber's bid had a sufficiently credible financing structure to justify its selection as the winning bid.  The Court should affirm.

## STATEMENT OF RELATED CASES

This Court has consolidated 49 appeals from the final sale order, which the district court entered first in the *Crystallex* docket and then on the dockets for the other cases.  In all, these cases have previously been before this Court in Nos. 18-2797, 18-2889, 18-3124, 21-1276, 21-1277, 21-1289, 22-1606, 22-8024, 23-1117, 23-1647, 23-1648, 23-1649, 23-1650, 23-1651, 23-1652, 23-1687, 23-1781, 23-3144, 23-3145, 23-3146, 23-3147, 23-3148, 23-3149, 23-3150, 23-3151, 23-3152, 23-3153, 23-3154, 24-2463, 24-2801, 24-2862, 25-2519, 25-3091, and 25-3323.

## STATEMENT OF ISSUES

1.  Whether the district court erred in approving Amber Energy's bid as the highest bid under 8 *Del. C.* § 324.

## STATEMENT OF THE CASE

ConocoPhillips generally adopts Crystallex's statement of the case. ConocoPhillips here sets out facts particularly related to its own judgments and the matters addressed in this brief.

### A.    ConocoPhillips' Property is Expropriated by Venezuela.

From the early 1990s to 2007, ConocoPhillips participated in the extraction and upgrading of crude oil from three oil fields in Venezuela. These ventures, known as the Petrozuata, Hamaca, and Corocoro projects, were structured via contracts between subsidiaries of ConocoPhillips and subsidiaries of Venezuela's state-owned oil company, PDVSA.

In 2007, Venezuela expropriated ConocoPhillips' interests in those projects unlawfully and without compensation. ConocoPhillips commenced various arbitrations seeking to recover its losses, ultimately leading to three judgments relevant here: two against PDVSA, referred to as the Petrozuata/Hamaca judgment (approximately $1.4 billion) and the Corocoro judgment (approximately $48 million), and one against the

Bolivarian Republic of Venezuela, referred to as the ICSID judgment (approximately $11.5 billion). *See ConocoPhillips Petrozuata BV* v. *Bolivarian Republic of Venezuela*, 2024 WL 4986937, at *1–2 (3d Cir. Dec. 5, 2024), *aff'g*, 2023 WL 8803522 (D. Del. Dec. 20, 2023); JA0288.

### B. ConocoPhillips Registers its Judgments and is Named a Sale Process Party.

ConocoPhillips duly registered its judgments in the District of Delaware and eventually obtained attachments on the shares of PDV Holding, Inc. ("PDVH"), the company that controls the CITGO refining enterprise. Ultimately, the Petrozuata/Hamaca judgment ended up third in the order of priority of judgments, and the Corocoro judgment eighth. *See* JA0287–88. Both of those judgments are expected to receive a recovery through the Amber transaction. Because those judgments are directly against PDVSA (not the Republic), neither judgment is the subject of the validity-of-attachment issue raised by the Venezuela Parties.

The ICSID judgment against the Republic ended up fourteenth in the priority order. JA0287–88. The Venezuela Parties unsuccessfully challenged the validity of that attachment, and then appealed the determination that the attachment satisfied relevant exceptions to the

Foreign Sovereign Immunities Act to this Court, which affirmed. *See ConocoPhillips Petrozuata BV*, 2024 WL 4986937, *aff'g*, 2023 WL 8803522. That judgment is not expected to receive a recovery under the Amber transaction, nor was it contemplated to receive a recovery under Gold Reserve's transaction.

Over the many years of this proceeding, there was an extensive process in the district court to design and ultimately implement the process for sale of the PDVH shares to satisfy the attachments granted to ConocoPhillips, Crystallex, and the many other additional judgment creditors. As part of that process, ConocoPhillips served as a "Sale Process Party" in the district court. As a Sale Process Party, ConocoPhillips took on a special role in helping to design the sale process and ensure that it was conducted in a fair and transparent manner, and was uniquely situated to do so given its role as a holder of three judgments, one near the top, one in the middle, and one near the bottom of the priority order. JA0277.

C.    **The Gold Reserve and Amber Bids Compete at the Sale Hearing.**

By the time of the sale hearing, two potential bids remained in contention, one from Amber Energy, and one from Gold Reserve, known as the Dalinar bid.  JA0337.

As the district court carefully explained, the reason the shares of PDVH have value is because PDVH owns 100% of CITGO Holding, Inc., which in turn owns 100% of CITGO Petroleum Corporation.  JA0353, JA0268.  CITGO Petroleum Corporation and its subsidiaries operate the fifth-largest oil refining enterprise in the United States, and sell petroleum products through approximately 4,000 branded gas stations.  JA0268.  All of the value in the corporate family is from the assets of CITGO Petroleum Corporation; CITGO Holding and PDVH are merely holding companies.  JA0353, JA0391 (at n.21).

The Gold Reserve/Dalinar bid was a leveraged-credit bid that had essentially no cash payments being made by the bidders themselves.  Gold Reserve intended to borrow the funds needed to make cash payments to the senior creditors by obtaining financing secured by liens on the assets of CITGO Petroleum Corporation and its subsidiaries, and

then upstreaming the money to pay the judgment creditors in this proceeding, who hold attachments on the PDVH shares.

The manner in which Gold Reserve proposed to place liens on CITGO Petroleum Corporation and its subsidiaries was to create an acquisition vehicle, Adolin Holdings, Inc. ("Adolin"), which would initially be the borrower under Gold Reserve's acquisition financing. JA0341. Adolin would then be merged into CITGO Petroleum Corporation, and CITGO Petroleum Corporation would become the obligor on the financing and grant liens on substantially all of its assets. *See* JA0341–42.

Gold Reserve and the other members of its bidding consortium (including XYQ, formerly Siemens, and an appellant here) then agreed to contribute their judgments into the bid, generating the ultimate headline price. *See* JA0339–41.

Gold Reserve's proposal to finance the bid through placing liens on CITGO Petroleum Corporation and its subsidiaries put Gold Reserve on a collision course with the holders of PDVSA bonds that matured in 2020, referred to as the 2020 Bondholders. *See* JA0289. The 2020 Bondholders, who are owed approximately $2 billion in principal amount, claimed to have been granted a pledge of 50.1% of the stock of CITGO

9

Holding, the immediate parent company of CITGO Petroleum Corporation. *Id.* The validity of that pledge was the subject of a many years-long litigation in the Southern District of New York and the Second Circuit, ultimately resulting in a $3 billion judgment (including interest) in the 2020 Bondholders' favor, subject to a pending appeal. *See* JA0290–91, JA0334–36.

The 2020 Bondholders contend that, among other rights granted to them under their Pledge Agreement, they have the right to vote their 50.1% interest in CITGO Holding, and to block the merger of CITGO Petroleum Corporation with Adolin. JA0400. Absent the Adolin-CITGO Petroleum Corporation merger, Gold Reserve has no way to grant liens on CITGO Petroleum Corporation's assets. JA0342. This would defeat the viability of Gold Reserve's financing and therefore its bid. *Id.* Unsurprisingly, considering that the effect of Gold Reserve's bid is to structurally subordinate the 2020 Bondholders' interest in CITGO Petroleum Corporation's assets by billions of dollars for nothing in return, the 2020 Bondholders made clear that they would make every effort to block that merger. Gold Reserve's ability either to block the 2020 Bondholders from exercising their rights under the Pledge Agreement—

such as by defeating the validity of the 2020 Bondholders' claimed pledge—or to invoke some other viable mechanism to pay them off if the pledge proved to be valid, was the central issue facing Gold Reserve's bid.

That was also the central distinction between Gold Reserve's bid and Amber's bid. Amber's bid included an agreement (the Transaction Support Agreement or TSA) with a supermajority of the 2020 Bondholders to release the pledge of the CITGO Holding stock in exchange for approximately $2.125 billion. JA0328. As a result, although Amber's bid is likewise financed in substantial part through placing liens on CITGO Petroleum Corporation and its subsidiaries, the 2020 Bondholders do not pose an obstacle to that financing. However, Amber's bid had a somewhat lower headline price for payments to creditors in this proceeding than Gold Reserve's.

In the district court's analysis, both Amber and Gold Reserve were effectively betting on the outcome of the 2020 Bondholder Litigation in the Southern District of New York. *See* JA0416 ("In essence, Gold Reserve and Amber took opposite sides of a bet that could only pay off for one of them."). If the 2020 Bondholders' pledge was invalid, then Gold

Reserve's financing was plausible; if valid, then Gold Reserve had no credible alternative.

### D.    Amber's Bid is Selected, and Gold Reserve Appeals.

As the district court recounted, during the final day of the evidentiary portion of the sale hearing, the Southern District of New York issued a decision determining that the 2020 Bondholders' pledge of 50.1% of CITGO Holding's stock was valid. JA0334–36. Despite Gold Reserve's protestations that its bid was still viable notwithstanding that decision, the district court concluded otherwise, finding that Gold Reserve's financing had effectively been blocked (barring reversal of the 2020 Bondholders' victory on appeal), and determining that Gold Reserve's backup plan to raise additional financing to pay off the 2020 Bondholders was illusory and speculative at best. *See* JA0343–51.

Accordingly, Amber's bid was selected as the winning bid. Gold Reserve and XYQ timely appealed. JA0010, JA0012.

### SUMMARY OF ARGUMENT

1. Gold Reserve and XYQ's position that 8 *Del. C.* § 324's use of the term "highest bidder" precludes discounting or disqualifying bids for risks inherent in the bid is not supportable. Even Gold Reserve and XYQ admit that "highest bidder" cannot mean "highest headline price

12

submitted without regard to other factors"—by that standard, Gold Reserve was not the highest bidder because a variety of non-actionable bids were even higher.  Instead, Gold Reserve and XYQ contend that because the Special Master had recommended Gold Reserve's bid at one point in the sale process, from that point forward that bid was forever qualified and actionable, and the only permissible consideration was headline price.  But that rule has no support in the case law or the statutory language and appears to be entirely made up.  The district court correctly treated Gold Reserve's bid as much less valuable than Amber's because, as the district court concluded, Gold Reserve's bid had severe closing risk, particularly following the Southern District of New York's decision, which warranted a major discount to its headline price or removal from consideration altogether.

2.    The district court's factual findings and legal conclusions supporting that determination are clearly correct and foreclose Gold Reserve and XYQ's appeals.  The district court correctly found that "for the Dalinar Bid to be able to close, Gold Reserve needs at least one of the following three premises to be correct:  (i) the 2020s will lose on appeal, (ii) Dalinar will somehow come up with the financing to reach a

settlement with the 2020s, or (iii) Gold Reserve is correct that OFAC action is required in order for the 2020s to exercise their rights and the 2020s will be unable to obtain such OFAC approval." JA0351. The district court carefully evaluated those possibilities and concluded that they rendered Gold Reserve's bid far too risky, or at least that those risks required discounting the value of Gold Reserve's bid so significantly that it was much lower than Amber's bid. There is no basis to disturb those findings under any standard of review, let alone to conclude that the district court clearly erred. This Court should affirm.

## STANDARD OF REVIEW

The Venezuela Parties state that the order below is reviewed for abuse of discretion, and neither Gold Reserve nor XYQ argue otherwise. To the extent that Gold Reserve and XYQ challenge the district court's factual findings or the application of those factual findings in selecting the highest bidder, Gold Reserve and XYQ present either purely factual disputes, or mixed questions of law and fact that are primarily factual. Both challenges to factual findings and challenges to the lower court's resolutions of mixed questions of law and fact that are predominantly factual are reviewed only for clear error. *Wilkinson* v. *United States*, 131

F.4th 134, 138 (3d Cir. 2025); *see Bufkin* v. *Collins*, 604 U.S. 369 (2025);

*U.S. Bank N.A. ex rel. CWCapital Asset Management LLC* v. *Village at*

*Lakeridge, LLC*, 583 U.S. 387 (2018); Fed. R. Civ. P. 52(a)(6).

## ARGUMENT

### I.  The District Court Permissibly Considered Closing Risk in Evaluating Gold Reserve's Bid.

Gold Reserve and XYQ would have a simpler statutory argument if

they were to argue that 8 *Del. C.* § 324(a)'s command that shares of stock

must be sold "at public sale to the highest bidder" must be applied to

mean "highest headline price submitted at the auction without regard to

other factors." 8 *Del. C.* § 324(a).  But they do not and cannot argue for

that interpretation because Gold Reserve's bid would not have prevailed

under that rule.  Various other parties submitted "bids" which had a

higher headline price than Gold Reserve's.  *See, e.g.*, JA0315, JA5916,

JA0393.  Yet Gold Reserve does not question that those bids were

appropriately not considered because of their various deficiencies other

than headline price.

Instead, Gold Reserve and XYQ argue for an interpretation of

§ 324(a) in which the district court had the ability to set "qualification

criteria" in advance of the sale hearing, but once the Special Master

deemed Gold Reserve's bid to be a qualified bid at some point, the court no longer had any discretion to consider issues relating to the bid's viability—even if an event occurred during the sale process that rendered the bid unworkable or required a major discount to account for contingencies inherent in the bid. *See* GR Br. at 34. Instead, in Gold Reserve's view, the only permissible consideration after the Special Master made the recommendation of the Gold Reserve bid was headline price. But that rule is completely made up; it has no support in Delaware law or the statutory language.

Although Gold Reserve and XYQ assert that the record evidence establishes that Gold Reserve's "bid was conforming and actionable," that assertion is not supported by the citation, JA5917 (¶ 67), which is merely the Special Master's *recommendation* of Gold Reserve as the highest bidder. The Special Master's *recommendation* was not a determination by the district court that the bid was actionable, and, in fact, the court ultimately ruled that it was not actionable. That recommendation also pre-dated the decision in the Southern District of New York on the validity of the 2020 Bondholders' pledge.

Regardless, the concession that a court supervising an auction can set qualification criteria to screen out non-actionable bids effectively forecloses Gold Reserve and XYQ's argument. There is no real difference between a court disqualifying or substantially discounting a bid for closing risk before an auction or during the auction itself; there is certainly no basis in the statutory language for drawing that distinction.

As explained in the next section, the district court properly concluded that Gold Reserve's failure to address the risks to its bid presented by the 2020 Bondholders' pledge of the CITGO Holding stock—a pledge which was adjudicated to be valid *during the course* of the sale hearing—rendered its bid far too speculative and risky to warrant selection. Likewise, there can be no real question that a bid that is subject to an unlikely-to-be-satisfied set of contingencies is necessarily much less valuable—in other words, much *lower*—than a similar bid that has fewer or no contingencies. That is the way in which transactions are valued in any other context under Delaware law, and Gold Reserve and XYQ present no law requiring some other result in the forced-sale context. *See, e.g.*, *Arnold* v. *Soc'y for Sav. Bancorp.*, 650 A.2d 1270, 1282–83 (Del. 1994) (a valuation that was "inextricably bound . . . to a number

of speculative contingencies . . . was too unreliable to be material" for purposes of stockholder disclosure); *DFC Global Corp.* v. *Muirfield Value Partners, L.P.*, 172 A.3d 346, 372–73, 383–88 (Del. 2017) ("fair value" analysis in appraisal context requires consideration and discounting for risk); *In re Appraisal of Regal Ent. Grp.*, 2021 WL 1916364, at *18 (Del. Ch. May 28, 2021) ("firms should be valued based on the expected value of their future cash flows, discounted to present value in a manner that accounts for risk"); *see generally* Crystallex Br. at 58.

## II.    Gold Reserve and XYQ's Challenges to the District Court's Findings Are Unpersuasive.

XYQ, and to a lesser extent Gold Reserve, half-heartedly present a grab-bag of challenges to the district court's underlying determinations leading to its determination that Amber was the highest bidder. Those challenges are overwhelmingly challenges to the district court's factual findings or its resolution of mixed questions of law and fact that are primarily factual—either way, those challenges are reviewed only for clear error. *Village at Lakeridge*, 583 U.S. at 396; *Wilkinson*, 131 F.4th at 139. But under any standard of review the district court was correct.

ConocoPhillips joins Crystallex's responses in substantial part, and offers the following additional points.

18

## A.    The District Court Correctly Found that the 2020 Bondholders Posed a Crippling Risk to Gold Reserve's Bid.

In a series of carefully considered findings, the district court explained in great detail many of the reasons to doubt that Gold Reserve's bid could ever close, or alternatively, all the reasons to discount its bid to a value far below Amber's.

The dispositive determinations are as follows.

*First*, the district court found that Gold Reserve's bid was contingent on being able to place liens on CITGO's assets, and that failing to do so would be fatal to the bid.  JA0342.

*Second*, the manner in which Gold Reserve proposed to place liens on CITGO's assets was to effectuate a merger between an acquisition vehicle, Adolin, and CITGO Petroleum Corporation.  JA0341–42.

*Third*, the district court concluded that the 2020 Bondholders could vote their pledged shares of CITGO Holding to block the proposed Adolin-CITGO Petroleum Corporation merger, JA0289, or otherwise take steps to block the merger, at least absent intervention from the U.S. Treasury's Office of Foreign Assets Control ("OFAC") or reversal on appeal.  *See* JA0351 ("It appears that, for the Dalinar Bid to be able to close, Gold Reserve needs at least one of the following three premises to be correct:

19

(i) the 2020s will lose on appeal, (ii) Dalinar will somehow come up with the financing to reach a settlement with the 2020s, or (iii) Gold Reserve is correct that OFAC action is required in order for the 2020s to exercise their rights and the 2020s will be unable to obtain such OFAC approval."); JA0411 ("there is a realistic possibility that the 2020 Bondholders would be able to disrupt the Dalinar Sale Transaction, either by voting their shares of CITGO Holding to block the Adolin-CITGO merger (which is fundamental to the Dalinar Bid) or by seeking an injunction against that transaction.").

*Fourth*, the district court determined that Gold Reserve's proposed "backup financing" intended to be used to pay off the 2020 Bondholders if they attempted to block the merger was "illusory" and their hopes to obtain other financing amounted to "little beyond speculation."  JA0413; *accord* JA0411 ("the record confirms that Gold Reserve does not truly have access to sufficient financing, at least at this time, to address the issue of the 2020s by paying them.").

*Fifth*, the district court concluded that "Gold Reserve's view – which is that OFAC will indefinitely prevent the 2020 Bondholders from exercising their rights while nonetheless granting a license to allow the

Dalinar Energy Bid to close – seems implausible, especially as OFAC has elsewhere stated that '[i]n making these licensing determinations, OFAC has committed to fair and equivalent treatment of potential creditors.'" JA0399.

*Sixth*, the district court found that there was "no basis whatsoever to believe that Judge Failla – who just weeks ago upheld the 2020 Bondholders' rights under the pledge – would now allow the value of those same bonds to be eviscerated by staying the 2020 Bondholders' exercise of their rights while allowing the sale transaction proposed by Dalinar Energy to close." JA0401 (citation modified). Accordingly, Gold Reserve's only hope was the possibility that the 2020 Bondholders might lose on appeal.

The combination of those findings, all of which are reviewed for clear error (but are correct under any standard), dooms Gold Reserve and XYQ's appeals on the sale-related issues.

In that context, Gold Reserve and XYQ's various statements that there is no dispute that Gold Reserve had submitted a confirming and qualified bid, or that the 2020 Bondholders posed no risk to the transaction, blink reality. *See, e.g.*, XYQ Br. at 11 ("The record contains

no testimony, document, or analysis suggesting that the 2020 Bondholders would seek to block Gold Reserve's closing."). Of course, those issues were heavily disputed below, and there is obviously an evidentiary basis for believing that the 2020 Bondholders would attempt to block the bid; ConocoPhillips and Crystallex repeatedly argued and marshalled evidence that Gold Reserve was not a qualified bid, particularly after the Southern District of New York's decision, the district court determined that Gold Reserve was not a qualified bid, JA0407, and the district court found that the 2020 Bondholders would seek to block the transaction, JA0411.[4]

Gold Reserve and XYQ also contend that various interim orders leading up to the final sale order, in particular with respect to the "overbid minimum," were improperly disregarded. Those arguments are not correct. But even if they were, any error is at this point harmless.

---

[4] Likewise, XYQ's argument that "[n]o witness identified a single provision of the Pledge," XYQ Br. at 11, that would be violated by Gold Reserve's proposed financing entirely misses the point; the dispositive problem is that the Pledge Agreement on its face grants the 2020 Bondholders the right to vote 50.1% of the stock of CITGO Holding, with all the rights that entails, including the right to block the Adolin-CITGO Petroleum Corporation at the heart of Gold Reserve's financing. *See* JA0289.

Had the Special Master believed that the overbid minimum precluded him from recommending the Amber bid and thus Gold Reserve's bid remained the recommended bid going into the sale hearing, the district court's findings demonstrate that it still would have selected Amber's bid once the Southern District of New York upheld the validity of the 2020 Bonds. *See* JA0416. The overbid-minimum requirement is thus essentially irrelevant given that the district court did not consider Gold Reserve's bid to be viable, or the highest bid. Thus, any purported violation of the overbid minimum was harmless error which did not affect Gold Reserve or XYQ's substantial rights. *See* 28 U.S.C. § 2111 ("On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties."); Fed. R. Civ. P. 61.

Gold Reserve and XYQ's remaining arguments on the viability of Gold Reserve's bid are likewise without merit. The district court did not ignore Gold Reserve and XYQ's arguments that OFAC would block the 2020 Bondholders from exercising their rights; that contention was considered and rejected based on the evidentiary record. *Compare* XYQ

Br. at 12 *with* JA0399. And contrary to XYQ and Gold Reserve's position, the district court also concluded that the 2020 Bondholders might seek an injunction and had other means to block the transaction.[5] *Compare* XYQ Br. at 12–13 *with* JA0411.

Whether viewed through the lens of the district court's finding that Gold Reserve's bid was unacceptably risky, or that it needed to be discounted to such a great extent as to render it vastly less valuable than Amber's bid, the district court's determination that Amber's bid was higher than Gold Reserve's unworkable bid is clearly right.

## B.    The District Court Correctly Found that Amber's Bid Was Financed in a Realistic Manner.

XYQ contends that the Transaction Support Agreement, in which approximately 75% of the 2020 Bondholders have agreed to release the pledge of the CITGO Holding shares so as to permit Amber to finance the transaction using CITGO's underlying assets, is insufficiently certain. According to XYQ, 75% of the 2020 Bondholders are not capable of releasing the pledge following a default as a contractual matter, or doing

---

[5] XYQ's citation to JA8609 does not contain any reference to the 2020 Bondholders not seeking an injunction; in any case, the 2020 Bondholders represented to the district court that they *would* seek an injunction, and the district court so concluded. *Contra* XYQ Br. at 16.

so might violate the Trust Indenture Act based on *Marblegate Asset Management, LLC v. Education Management Corp.*, 846 F.3d 1, 16 (2d Cir. 2017).  *See* XYQ Br. at 13–16.

Both of those arguments are entirely without merit or worse, and the district court properly rejected them.  As was repeatedly pointed out below, *Marblegate* stands for precisely the opposite position to the one XYQ argues here.  *Marblegate* held that a transaction that released all of the guarantees and collateral associated with a notes indenture, and preserved only the right of the noteholders to seek payment of the notes from the original issuer, did *not* violate the Trust Indenture Act or the related section of an indenture implementing the Trust Indenture Act. 846 F.3d 1, 16–17.  The same is true here.

As for the district court's analysis of whether two-thirds of the 2020 Bondholders could release the pledge, the district court's conclusion that they could was correct.  JA0401–07.  XYQ's position lacks support in the Pledge Agreement and defies common sense.  The notion that following a default on secured bonds, the beneficiaries of the pledge, in the course of seeking payment, lack the ability to release that pledge in exchange for consideration unless the *defaulting borrower* consents to the release,

25

would be a nonsensical provision. And, of course, that is not what the Pledge Agreement says; the Pledge Agreement states that two-thirds of the noteholders can agree to release the pledge following a default, which everyone agrees has occurred. JA0402–04. The provision governing amendments to the terms of the indenture is not the governing provision for the reasons stated by the district court. JA0404.

### C. The District Court Was Not Required to Select Gold Reserve's Bid and, Once the Bid Failed, Hold a Re-Do Auction Later.

With even less justification, XYQ contends that the district court should have picked Gold Reserve's bid, and then if it failed to close, it could have held a re-do auction. XYQ Br. at 18. ConocoPhillips has been waiting 17 years to be paid; many of the other judgment creditors have likewise been seeking payment for over a decade. XYQ's suggestion that the other creditors should have waited even longer while Gold Reserve's bid inevitably failed, when a more reliable alternative was already available, has little to recommend it. Refining enterprises such as CITGO are inherently cyclical businesses—there is no assurance that the PDVH shares would retain their value during the course of the proposed fail-and-re-auction process. The district court was not obligated to indulge the hopes of out-of-the-money creditors at the expense of the

more senior creditors who had a viable opportunity to receive payment on their long overdue judgments.  If the junior creditors believed PDVH was worth more than Amber was paying, they had every opportunity to submit a credibly financed bid of their own.

## CONCLUSION

The Court should affirm.

Respectfully submitted,

*/s/ Amy R. Wolf*

AMY R. WOLF
RICHARD G. MASON
MICHAEL H. CASSEL
WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, NY  10019
(212) 403-1000

MARCUS J. GREEN
MICHAEL S. KIM
KOBRE & KIM LLP
800 Third Avenue, 6th Floor
New York, NY  10022
(212) 488-1200

*/s/ Garrett B. Moritz*

GARRETT B. MORITZ
KEVIN A. RUDOLPH
ROSS ARONSTAM & MORITZ LLP
1313 N. Market Street, Suite 1001
Wilmington, DE  19801
(302) 576-1600

*Counsel for ConocoPhillips Appellees*

February 9, 2026

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that at least one attorney whose name appears on this response is a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

February 9, 2026                    /s/ *Garrett B. Moritz*

## CERTIFICATE OF COMPLIANCE

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because it contains 5,189 words, excluding the parts of the brief exempted by Rule 32(f).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in 14-point Century font.

3.      This brief complies with this Court's Rule 31.1(c) because the text of the electronic brief is identical to the text of the paper document, and that Windows Defender has been run on the file and that no virus was detected.

February 9, 2026                              /s/ *Garrett B. Moritz*

## CERTIFICATE OF SERVICE

I hereby certify that on this 9th day of February 2026, I caused the foregoing response to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Third Circuit by using the Court's CM/ECF system.  I further certify that service was accomplished on all parties via the Court's CM/ECF system.

February 9, 2026                              /s/ *Garrett B. Moritz*